**Lansing, Michigan**

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED JULY 30, 2010

STATE OF MICHIGAN

SUPREME COURT

DERITH SMITH,

      Plaintiff-Appellant,

v

ANONYMOUS JOINT ENTERPRISE,
GEORGE PRESTON, MARY BARROWS,
VILLAGE OF SUTTONS BAY, AND
CHARLES STEWART,

      Defendants,
and

DONALD BARROWS, JOHN STANEK,
and NOEL FLOHE,

      Defendants-Appellees.

Nos. 138456 to 138458

BEFORE THE ENTIRE BENCH

WEAVER, J.

In this case, we decide whether plaintiff, Derith Smith, presented clear and convincing evidence at trial to support the jury's finding that defendants John Stanek, Donald Barrows, and Noel Flohe defamed plaintiff by mass-mailing copies of a

personnel report containing false information about her. After conducting an independent review of the record, we conclude there exists clear and convincing evidence that Stanek and Barrows acted with "actual malice," but that plaintiff has failed to meet her evidentiary burden as to Flohe.

Accordingly, we affirm the result reached by the Court of Appeals as to Flohe, but reverse the result it reached as to Stanek and Barrows. We remand this matter to the Court of Appeals for consideration of defendants' other issues, including whether the handwritten caption on the mailed report constitutes a non-defamatory statement of opinion when considered in its context within the report as a whole, whether the caption is provable as false, and whether defendants are entitled to the protection afforded by Michigan's statutory fair reporting privilege.

## I. FACTS AND PROCEDURAL BACKROUND

This defamation action arises from the mass mailing of a personnel report written about plaintiff, Derith Smith. Plaintiff worked for the village of Suttons Bay ("the Village") in Leelanau County. Plaintiff's supervisor, Suttons Bay Village Manager Charles Stewart, composed the personnel report ("the Stewart report"), which includes allegations that plaintiff was an independent contractor but had been compensating herself as an employee. The Stewart report also includes allegations that plaintiff had never been issued a W-2 form, received benefits to which she was not entitled, paid herself at a higher rate than the rate for which she was approved, and was not a "team player." Stewart presented his report to the Village Personnel Committee, and the Committee voted to terminate plaintiff's employment.

2

Plaintiff filed a claim for unemployment compensation benefits. The Village opposed plaintiff's claim, arguing that plaintiff was not an employee but rather an independent contractor and, therefore, not entitled to benefits. A subsequent investigation and review revealed that various allegations against plaintiff in the report were false. Accordingly, the Village withdrew its opposition to plaintiff's claim.

Plaintiff believed that she was wrongfully terminated, but did not institute a lawsuit against the Village because she had secured employment as the Elmwood Township supervisor in the November 2004 election. On May 17, 2005, while serving as Elmwood Township Supervisor, plaintiff received an anonymous mailing. The mailing included a copy of the Stewart report, with an additional handwritten caption stating, "Attention: Suttons Bay Villagers Alledged [sic] Misuse of Village Taxpayer Funds?" and "Derrick [sic] Smith." Plaintiff later learned that copies of the Stewart report, including the caption, had been mailed to hundreds of citizens in Leelanau County.

At the time of the mass mailing, defendants Stanek, Barrows, and Flohe were involved in an informal group of concerned Leelanau County citizens. The group met fairly regularly to discuss various issues, including local politics and elections. It is undisputed that Stanek, Barrows, and Flohe were displeased with plaintiff's performance as township supervisor and were responsible for the mass mailing of the Stewart report.[1]

---

[1] The trial testimony revealed apparent political discourse between plaintiff and defendants. Stanek and Flohe were Elmwood Township officials in 2003, and plaintiff was involved in a group of citizens that started a recall campaign against them. While both Stanek and Flohe survived the recall, they were defeated in the 2004 election.

The record establishes that Barrows contacted Suttons Bay Village Treasurer Jerry VanHuystee on several occasions in 2004, asking whether VanHuystee had any information about plaintiff. VanHuystee testified that he told Barrows that he did not know of anything illegal done by plaintiff. After several requests for information from Barrows, VanHuystee retrieved the Stewart report from the Village's records and made a copy of it.[2] VanHuystee put the copy of the Stewart report in an envelope and marked it with Barrows' name. VanHuystee then dropped off the envelope at his sister-in-law's home, where Barrows was to pick it up. The copy of the Stewart report contained no handwritten caption at this time.

Barrows testified that he picked up the envelope containing the Stewart report and brought a copy of the report to a citizens' meeting held at Stanek's office during the first week of May 2005. Stanek, Barrows, and Flohe were all present at this meeting, although the trial testimony indicated that Flohe arrived late. At this particular meeting, copies of the Stewart report were available for attendees to view, and there was discussion regarding whether the Stewart report should be mailed to other citizens. The trial testimony establishes that some attendees favored mailing the report, while others did not. George Preston was also present at this meeting, and he testified that he had

Stanek and Barrows had been supporters of Flohe in his 2004 bid for re-election; however, plaintiff was elected to replace Flohe as Elmwood Township supervisor.

[2] Plaintiff does not allege on appeal that the Stewart report was improperly obtained from the Village's records or that it was not a "public record."

4

expressed hesitation about mailing the Stewart report. Preston told the other attendees at the meeting that he would contact Stewart to verify the report's accuracy.

Preston and Stewart testified that Preston had contacted Stewart and informed him of the concerned citizens' intent to mail the Stewart report. Stewart confirmed with Preston that plaintiff had done nothing illegal and that the report should not be distributed. Preston and Stanek both testified that Preston relayed this information to Stanek; however, the trial testimony is somewhat conflicting with regard to exactly when he did so.

Barrows testified that he nonetheless took a copy of the Stewart report to a copy shop and paid to have approximately 500 copies made. Approximately 420 of those copies were placed into envelopes and sealed by the store's staff. The envelopes were placed in boxes along with the remaining 80 copies of the Stewart report. Barrows testified that on May 16, 2005, he took the boxes to Stanek's office where he, Stanek, and Flohe worked together to stamp and label the stuffed envelopes. The envelopes were then taken to the post office and mailed to citizens in Leelanau County. Citizens within the county began receiving the mailings by May 17, 2005, while the remaining copies of the Stewart report were displayed at citizen and township meetings.

Plaintiff subsequently brought a defamation claim against Stanek, Barrows, and Flohe.[3] Defendants moved for summary disposition, arguing that their actions were

---

[3] Plaintiff initially filed suit against the Village of Suttons Bay, Stewart, and Preston as well. However, those defendants were dismissed from the litigation.

covered by the fair reporting privilege, MCL 600.2911(3).[4] The trial court denied summary disposition, ruling that plaintiff had alleged sufficient evidence, which, if believed by a jury, would show that defendants mailed the Stewart report with actual knowledge that it was false or with reckless disregard for the truth of the report.[5] The trial court additionally concluded that "if a jury finds that the publication was false and not made in good faith and with an honest belief that the report was true, the qualified privilege is defeated and damages may be awarded."

A jury trial was held, and a verdict was reached in favor of plaintiff. The jury awarded plaintiff monetary damages and a public apology in the form of a legal notice. The Court of Appeals reversed and remanded for entry of a judgment of no cause of action, concluding that defamation could not be established as a matter of law because

---

[4] MCL 600.2911(3) provides, in pertinent part:

> Damages shall not be awarded in a libel action for the publication or broadcast of a fair and true report of matters of public record, a public and official proceeding, or of a governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body, or for a heading of the report which is a fair and true headnote of the report.

[5] The trial court specifically noted the following evidence presented by plaintiff: Barrows' deposition testimony that it was his idea to mail the Stewart report to the masses and that he did so with Stanek and Flohe; a letter written by Stewart, but not sent, to Barrows in which Stewart recounts telling Preston prior to the mass mailing that plaintiff did not engage in any criminal wrongdoing; an email dated May 19, 2005, sent by Stewart to plaintiff, acknowledging that the allegations in the Stewart report were inaccurate; Stewart's deposition testimony that he told Preston prior to the mass mailing that plaintiff did not engage in any wrongdoing; and Preston's deposition testimony that he advised defendants not to send the mailing until he could investigate the truthfulness of the report; and Preston's deposition testimony that he advised Stanek, among others, that the allegations of wrongdoing in the report were false.

6

defendants' failure to investigate the contents of the report did not constitute the "reckless disregard" required for a finding of actual malice,[6] and defendants could not be held liable for relying on a report that they did not prepare.[7] The Court of Appeals noted that Stewart prepared the report, and it contained his "erroneous view of the status of plaintiff's employment."[8] With respect to the handwritten caption added to the report, the Court of Appeals concluded that it was merely an expression of opinion.[9]

This Court granted plaintiff's application for leave to appeal to address whether the Court of Appeals erred in determining that plaintiff did not present sufficient evidence to support a finding of actual malice.[10]

## II. STANDARD OF REVIEW

The inquiry into whether evidence in a defamation case is sufficient to support a finding of actual malice presents a question of law.[11] To determine whether the

---

[6] A public official or public figure plaintiff may prevail in a defamation action if he or she establishes that the alleged defamatory statements were made with "actual malice." *New York Times Co v Sullivan*, 376 US 254, 279-280; 84 S Ct 710; 11 L Ed 2d 686 (1964).

[7] *Smith v Anonymous Joint Enterprise*, unpublished opinion per curiam of the Court of Appeals, issued February 3, 2009 (Docket Nos. 275297, 275316, and 275463), pp 5-6.

[8] *Id*. at 5.

[9] *Id*.

[10] *Smith v Anonymous Joint Enterprise*, 485 Mich 870 (2009).

[11] See *Bose Corp v Consumers Union of United States, Inc*, 466 US 485, 510-511; 104 S Ct 1949; 80 L Ed 2d 502 (1984).

constitutional standard for defamation of a public figure[12] has been satisfied, a reviewing court must consider the factual record in full.[13] The reason for this "independent review" of the record is "[o]ur profound national commitment to the free exchange of ideas, as enshrined in the First Amendment . . . ."[14] Therefore, we must analyze the alleged defamatory statements at issue and their surrounding circumstances to determine whether those statements are protected under the First Amendment.[15]

The importance of protecting First Amendment liberties through an application of the "independent review" standard is well-established.[16] While this Court generally reviews questions of law de novo, "the independent review function is not equivalent to a '*de novo*' review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence to decide whether or not it believes that judgment should be entered for plaintiff."[17] If the reviewing Court determines that actual malice

---

[12] The parties do not dispute that plaintiff's status as an elected township official renders her a public figure or a public official.

[13] *Harte-Hanks v Connaughton*, 491 US 657, 688; 109 S Ct 2678; 105 L Ed 2d 562 (1989). See also *Bose Corp*, 466 US at 511 ("Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'").

[14] *Harte-Hanks*, 491 US at 686.

[15] *New York Times Co*, 376 US at 285.

[16] See *id.* (stating that "[w]e must 'make an independent examination of the whole record,' so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression") (citation omitted).

[17] *Bose Corp*, 466 US at 514 n 31.

has been established with convincing clarity, the judgment of the trial court may only be reversed on the ground of some other error of law or clearly erroneous finding of fact.[18]

Likewise, an appellate court should not conduct an independent review of credibility determinations, disregard findings of fact, or create new findings of fact.[19] Instead, "the court should exercise independent judgment regarding whether, as a matter of constitutional law, the evidence in the record supports the verdict,"[20] while giving "due regard" to the trial court's "opportunity to observe the demeanor of the witnesses . . . ."[21] Credibility determinations made by the finder of fact must be examined to ascertain whether they are clearly erroneous.[22]

### III. ANALYSIS

### A. LEGAL BACKGROUND

"'A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from

---

[18] *Id.*

[19] *Locricchio v Evening News Ass'n*, 438 Mich 84, 112 n 17; 476 NW2d 112 (1991) (suggesting that the independent review standard does not extend to "credibility determinations").

[20] *Id.*

[21] *Bose Corp*, 466 US at 499-500.

[22] *Harte-Hanks*, 491 US at 688.

associating or dealing with him.'"[23]  Generally, to sustain a claim of defamation, the following elements must be established:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.[24]

In the seminal case of *New York Times Co v Sullivan*, the United States Supreme Court recognized the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."[25]  The Court concluded that a plaintiff who is a public official may only prevail in a defamation action if he or she establishes that the alleged defamatory statements were made with "actual malice."[26]  "Actual malice" exists when the defendant knowingly makes a false statement or makes a false statement in reckless disregard of the truth.[27] The high threshold established by the "actual malice" standard was codified by our Legislature in MCL 600.2911(6), which provides:

---

[23] *Nuyen v Slater*, 372 Mich 654, 662, n *; 127 NW2d 369 (1964) (citation omitted).

[24] *Mitan v Campbell*, 474 Mich 21, 24; 706 NW2d 420 (2005).

[25] *New York Times*, 376 US at 270.

[26] *Id*. at 279-280. See also *Curtis Publishing Co v Butts*, 388 US 130; 87 S Ct 1975; 18 L Ed 2d 1094 (1967) (extending the *New York Times* actual malice standard to public figures).

[27] *New York Times*, 376 US at 280.

10

An action for libel or slander shall not be brought based upon a communication involving public officials or public figures unless the claim is sustained by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false.

Pursuant to this statute, a plaintiff who is a public official or public figure bears the burden of sustaining a defamation claim by clear and convincing proof that the alleged defamatory statement was made with actual malice, specifically, either knowledge that the statement was false or with reckless disregard of whether or not the statement was false. Clear and convincing proof is that which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the precise facts in issue.[28] Evidence may be uncontroverted and yet not be clear and convincing.[29] Conversely, evidence may be clear and convincing despite the fact that it has been contradicted.[30]

After *New York Times*, the United States Supreme Court clarified the scope of the actual malice standard. In *St Amant v Thompson*, the Court explained that "actual malice" is a subjective concept.[31] However, a defendant in a defamation case cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true."[32] Instead, "[t]he finder of fact must determine whether the

---

[28] *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995) (citation omitted).

[29] *Id*.

[30] *Id*.

[31] See *St Amant v Thompson*, 390 US 727, 731; 88 S Ct 1323; 20 L Ed 2d 262 (1968).

[32] *Id.* at 732.

publication was indeed made in good faith."[33]  The Court further held in *Harte-Hanks, Inc v Connaughton* that "only through the course of case-by-case adjudication can [a court] give content to [the actual malice] constitutional standard[]."[34]  The term "malice" in the actual malice standard does not equate to a showing of ill will.[35]  Rather, the standard requires a showing that, at minimum, the allegedly defamatory statements were made with a "reckless disregard for the truth."[36]

The manner in which a plaintiff may establish "reckless disregard for the truth" for purposes of the actual malice standard cannot necessarily be expressed in a singular definition.[37]  A plaintiff must prove something "more than a departure from reasonably prudent conduct."[38]  Likewise, a plaintiff must present sufficient evidence to justify a conclusion that the defendant made the allegedly defamatory publication with a "high degree of awareness" of the publication's probable falsity,[39] or that the defendant "entertained serious doubts as to the truth" of the publication made.[40]  And while "courts

---

[33] *Id.*

[34] *Harte-Hanks*, 491 US at 686.

[35] *Id.* at 666.

[36] *Id.* at 667.

[37] *St Amant*, 390 US at 730.

[38] *Harte-Hanks*, 491 US at 688.

[39] *Garrison v Louisiana*, 379 US 64, 74; 85 S Ct 209; 13 L Ed 2d 125 (1964).

[40] *St Amant*, 390 US at 731.  The Supreme Court has additionally recognized that even a false statement may be protected from defamation claims if it cannot be

12

must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry."[41]

Finally, it is well settled that the failure to investigate the accuracy of a communication before publishing it, even when a reasonably prudent person may have done so, is not sufficient to establish that the defendant acted with reckless disregard for the truth.[42]  However, a "purposeful avoidance of the truth" is dissimilar from the mere "failure to investigate," and "a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of a publication is sufficient to find reckless disregard.[43]  Furthermore, when a defendant has reported a third party's allegations,

---

reasonably interpreted as stating actual facts about an individual.  *Milkovich v Lorain Journal Co*, 497 US 1, 16-17; 11 L Ed 2d 1; 110 S Ct 2695 (1990).  So too has our Court of Appeals.  In *Ireland v Edwards*, 230 Mich App 607, 611-612; 584 NW2d 632 (1998), an attorney representing the father in a custody dispute commented on the mother's actions and her fitness as a parent.  The mother, in turn, filed a defamation claim against the attorney.  The Court of Appeals concluded that many of the allegedly defamatory statements, when read or heard in context, "could not reasonably be understood as stating actual facts" about the mother and that the attorney's statements about the time the mother spent with the child amounted to "'rhetorical hyperbole.'"  *Id*. at 618-619.  Thus, the Court of Appeals concluded that the statements were not actionable.  *Id*. at 619.

[41] *Harte-Hanks*, 491 US at 668, citing *Herbert v Lando*, 441 US 153, 160; 160 L Ed 2d 115; 99 S Ct 1635 (1979).  See also *Battaglieri v Mackinac Ctr for Pub Policy*, 261 Mich App 296, 306; 680 NW2d 915 (2004), which noted that circumstantial evidence may be introduced to show actual malice because it would be rare for a defendant to admit that he or she acted with actual malice.

[42] *St Amant*, 390 US at 731, 733.

[43] *Harte-Hanks*, 491 US at 692.

reckless disregard for the truth of the allegations "may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."[44]

### B. APPLICATION OF ACTUAL MALICE STANDARD

#### 1. STANEK

Plaintiff first relies on evidence that, during a meeting at which all three defendants were present, Preston expressed hesitation about mailing the Stewart report and stated that he would speak to Stewart to verify the accuracy of the report's contents. Specifically, Preston testified that in response to a discussion about mailing the Stewart report, he informed others that it "probably wouldn't be a good idea" because "no one had any real knowledge if in fact [the] document was true or not."[45]

With regard to Stanek's liability, both Preston and Stanek testified that, at a monthly Elmwood Township meeting, Preston informed Stanek that he had spoken with Stewart and that Stewart confirmed that plaintiff had not done anything illegal. There were two monthly meetings at which this conversation could have occurred–either that of May 9, 2005 or June 13, 2005.

---

[44] *St Amant*, 390 US at 732.

[45] Preston additionally testified that there were probably less than 10 people present at the meeting, and he "definitely" thought that the group heard him say he wanted to investigate the accuracy of the Stewart report. Barrows testified that he heard Preston say that he would talk to Stewart about the report. In addition, Barrows testified that there was debate about whether the Stewart memo should be sent out or not. Stanek, however, testified that those who expressed hesitance to mail the Stewart report did not indicate their reasons, and that he did not hear Preston say he would talk to Stewart about the report.

Preston testified that his conversation with Stanek occurred sometime in the spring, and that while he cannot be certain of the month, he did not believe it was in June. In contrast, Stanek testified that he recalled that the conversation took place on June 13. In any event, Stanek did not deny that Preston informed him of Stewart's confirmation that plaintiff had not done anything illegal. If the jury believed that the conversation between Preston and Stanek did not take place before June 13, as Stanek asserts, plaintiff would not be able to establish that Stanek knew the allegations in the Stewart report were false *before* the mass-mailing. However, if the jury believed that the conversation between Preston and Stanek occurred at the May 9 meeting, then plaintiff would be able to establish that Stanek mailed the Stewart report despite the knowledge that it contained false information.

On this record, it is apparent that the jury did not believe that Preston waited until June 13 to tell Stanek about the Stewart report when citizens already started receiving the report by mail almost a month earlier on May 17 and expressed their concerns with its contents shortly thereafter. The testimony reveals that Preston already knew by May 2 or 4 that defendants were considering mailing the Stewart report, and that he had contacted Stewart about this at some point before May 17. Thus, the jury apparently did not believe Stanek's testimony that Preston did not report back to him until June 13, almost a month *after* the Stewart report had been distributed. Instead, the jury apparently chose to

believe Preston's testimony that he told Stanek about the Stewart report in the spring, but that he did not think it was as late as June.[46]

Here, the illogical timeline of events presented by Stanek, coupled with Preston's testimony that Stanek initially denied responsibility for the mailing and evidence that Stanek refused to make a retraction after admitting he knew that the contents of the Stewart report were false, lead us to conclude that the jury's finding that Stanek knew that the Stewart report contained false information or was aware of the reports probable falsity when he mailed copies of it was not clearly erroneous. We will not disturb the jury's credibility determinations in this regard.[47]

---

[46] We reject the concurrence/dissent's proclamation that Preston's testimony—that the conversation took place in "late spring, so that's May, June"—somehow definitively means that the earliest the conversation could have occurred was the third week of May. Tempting as it may be, we likewise decline to substitute our subjective interpretation of the record for that of the jury. Findings of fact, although not necessarily immune from review, and the opportunity to observe first-hand the demeanor of witnesses, even in the context of defamation claims subject to enhanced First Amendment scrutiny, remain inherently within the province of the jury. See *Steadman v Lapensohn*, 408 Mich 50, 53-54; 288 NW2d 580 (1980); *Cochrane v Wittbold*, 359 Mich 402, 408; 102 NW2d 459 (1960); *Bose Corp*, 466 US at 512.

[47] *Harte-Hanks*, 491 US at 688; *Locricchio*, 438 Mich at 112 n 17. Although the concurrence/dissent iterates on five separate occasions that it has conducted an independent review of the record, it does not appreciate the scope of that review. Specifically, it does not recognize that an independent review of the record is not the equivalent of having carte blanche to adjudicate the merits of a case. Indeed, it is the concurrence/dissent that does not heed well-established U.S. Supreme Court precedent holding that,

> in cases involving the area of tension between the First and Fourteenth Amendments on the one hand and state defamation laws on the other, we have frequently had occasion to review "the evidence in the . . . record to determine whether it could constitutionally support a judgment" for the

16

Moreover, we are satisfied that this evidence constitutes clear and convincing evidence that Stanek acted with actual malice. Although it is contradicted by Stanek's own testimony that he did not have knowledge of the Stewart report's falsity, his denial of such knowledge is not, in and of itself, sufficient to defeat plaintiff's claim that Stanek had the requisite knowledge to support a defamation claim.[48] The jury was undoubtedly presented with conflicting testimony here. Similarly, in *Harte-Hanks*, evidence was presented that, if believed, could effectively refute the claim of actual malice. However, as the United States Supreme Court explained in *Harte-Hanks*, we should not substitute the judgment of the jury with our own judgment of which testimony was most credible.[49] Accordingly, we do not find the jury's credibility determinations clearly erroneous and, therefore, we agree with the jury's finding with regard to Stanek's liability.

plaintiff. [*Time, Inc v Pape*, 401 US 279, 284; 91 S Ct 633; 28 L Ed 2d 45 (1971).]

Thus, the proper inquiry, misunderstood by the concurrence/dissent, is to ensure that a constitutionally sufficient quantum of evidence supports a judgment consistent with First Amendment principles.

[48] *St Amant*, 390 US at 732 ("The defendant in a defamation action brought by a public official cannot . . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith.").

[49] On the issue of credibility determinations in defamation actions, the Ninth Circuit has stated, "we read *Bose* and *Harte-Hanks* as creating a 'credibility exception' to the *New York Times* rule of independent review." *Newton v Nat'l Broadcasting Co*, 930 F2d 662, 671 (CA 9, 1990). Noting that the fact-finding function involves "'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts,'" *id*. at 671 n 13 (citation omitted), the court explained that the United States Supreme Court had drawn a thin line "between highly deferential review of credibility determinations and less deferential review of the factfinder's evaluation of other evidence relevant to the actual malice issue." *Id*. at 672.

## 2. BARROWS

Barrows testified that following plaintiff's election as township supervisor, he repeatedly asked VanHuystee, at least five times,[50] for information about plaintiff. Specifically, Barrows inquired whether plaintiff had been involved in any criminal activity. VanHuystee testified that he told Barrows on each of the five occasions that he did not know of any illegal conduct by plaintiff. Furthermore, VanHuystee testified that the occasions on which he told Barrows that plaintiff had not been involved in illegal activity were *prior* to May 16, 2005, the date on which Stanek, Barrows, and Flohe mailed the Stewart report.

Barrows denied knowing that the statements in the Stewart report regarding plaintiff were false. Yet Barrows' denial of such knowledge is not, in and of itself, sufficient to defeat plaintiff's claim that he had the requisite knowledge to support a defamation claim.[51] Not only was Barrows aware of Preston's initial hesitation to mail the Stewart report, but VanHuystee repeatedly told Barrows that he did not know of any illegal activity by plaintiff.

Indeed, Barrows' testimony provides a sound basis for the jury's finding of actual malice. The following exchange between plaintiff's counsel and Barrows is illustrative of Barrows' purposeful avoidance of the truth:

---

[50] In response to a question asking whether Barrows recalled talking to VanHuystee on five different occasions and requesting information showing that plaintiff had done something illegal, Barrows answered, "It could have been more than five, I don't remember."

[51] See *St Amant*, 390 US at 730.

*Q*: Did you hear Mr. Preston say that the group when he said don't send it, I'm going to go investigate, some of the group at least some members he didn't know how many, agreed that he should do that, did you hear him testify to that?

*A*: Yes, I did.

*Q*: And, did you agree, were you one of those people that Mr. Stewart agreed Mr. Stewart should go check—Mr. Preston should go check with Mr. Stewart, or didn't you agree with that?

*A*: I think it was neutral, I didn't care whether he went or not.

*Q*: You didn't disagree with him going?

*A*: I didn't care. I said he was going to do it, it wasn't anything of real interest to me.

\* \* \*

*Q*: What I'm asking about the meeting, didn't [Preston] tell you at the meeting, you knew at the meeting he said don't send it I'm going to go investigate, right?

*A*: That could very well be, I mean, that's something that—

*Q*: And, that you know that those statements were made by Mr. Preston before the mailing went out, correct?

*A*: Oh, yes, sure.

*Q*: And, we know the mailing occurred on May 15 or 16, right?

*A*: Right

*Q*: No doubt about that because we have the envelope, right?

*A*: That's right.

*Q*: So to wrap all those little beads together, you knew before you sent that mailing at least one person looked at it, said don't send it, I'm going to investigate, I'm going to go to the guy that wrote this memo, you knew that, right?

19

*A*: Yes.

After considering the evidence presented, including this testimony, the jury apparently found that Barrows acted with actual malice. This conclusion is eminently reasonable given that Barrows conceded that Preston had recommended that he not send the report because he wanted to verify its accuracy. Thus, there was sufficient evidence to support the jury's conclusion that Barrows acted with reckless disregard for the truth of the statements in the Stewart report. Although the evidence was controverted, we conclude that plaintiff sustained her burden of presenting the jury with clear and convincing proof that Barrows acted with actual malice when mailing the Stewart report.

We find further support for this conclusion in *Harte-Hanks*. In that case, the plaintiff, a candidate for an elective judicial office occupied by an incumbent, brought a defamation action against the defendant newspaper, which had published an article that damaged his personal and professional reputation. Shortly before the election, the plaintiff discovered evidence of a bribery scheme involving a member of the incumbent judge's staff. The plaintiff located a witness to that bribery, Patsy Stephens, and tape-recorded a four-hour interview of her during which she provided details of the bribery scheme. Eight people were present during that interview, including Stephens' sister, Alice Thompson.

The defendant endorsed the incumbent in the election and arranged a meeting with Thompson to discuss the alleged bribery scheme. Thompson asserted that the plaintiff had promised her and Stephens gifts and other consideration in exchange for Stephens'

statements implicating the incumbent's staff in the bribery scheme. Before printing an article concerning Thompson's allegations against the plaintiff, the defendant interviewed the plaintiff. The plaintiff categorically denied Thompson's assertion that he had offered an improper quid pro quo for Stephens' information, and provided the defendant with access to the tape recording of his interview with Stephens. The defendant did not listen to the recording. It nevertheless published a story alleging that the plaintiff had offered Thompson and Stephens jobs in exchange for their cooperation in building a bribery case against the incumbent's staff.

A jury returned a verdict for the plaintiff, and the Sixth Circuit Court of Appeals affirmed.[52] The United States Supreme Court granted certiorari to consider whether the lower courts had properly applied the *New York Times* actual malice standard and whether the plaintiff had presented clear and convincing evidence to support the jury's verdict.

The Court initially noted that the jury's verdict was largely premised on credibility determinations. In concluding that the plaintiff had satisfied his burden of proving his case by clear and convincing evidence, the Court relied heavily on circumstantial evidence of the defendant's actual malice. Notably, the Court cited the defendant's failure to review the tape recording of the plaintiff's interview with Stephens that would have confirmed or refuted portions of its article. The Court reasoned that "one might reasonably infer . . . that the decision not to listen to the tapes was motivated by a concern

---

[52] *Connaughton v Harte-Hanks Communications, Inc*, 842 F2d 825 (CA 6, 1988).

that they would raise additional doubts concerning Thompson's veracity."[53]  The Court

further stated:

> It is also undisputed that [the plaintiff] made the tapes of the Stephens interview available to the [defendant] and that no one at the newspaper took the time to listen to them.  Similarly, there is no question that the [defendant] was aware that . . . Stephens was a key witness and that they failed to make any effort to interview her.  Accepting the jury's determination that [the defendant's] explanations for these omissions were not credible, it is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges.  Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category.[54]

In this case, as in *Harte-Hanks*, Barrows could have readily confirmed the

accuracy of the Stewart report by doing exactly what Preston had done—contact Stewart

directly.  It appears the jury found that Barrows made a conscious decision not to hear

from the person most capable of confirming the truth or falsity of the report.  This is

significant in light of the fact that at a meeting, Preston impressed on Barrows (and

others, including Stanek) that the report should not be distributed because its accuracy

had not been verified.  And given the fact that Barrows repeatedly sought out

VanHuystee and VanHuystee told Barrows on at least five separate occasions that he did

not know of anything illegal done by plaintiff, the jury had ample evidence from which it

could conclude that Barrows acted in purposeful avoidance of the truth.

---

[53] *Harte-Hanks*, 491 US at 684.

[54] *Id*. at 692 (citations omitted).

22

The Stewart report contained relatively specific allegations of wrongdoing by plaintiff, including allegations of acts that would clearly constitute a misuse of taxpayer funds. Barrows knew that VanHuystee did not know of anything illegal done by plaintiff and that members of the group of concerned citizens that Barrows belonged to expressed concern about mailing the Stewart report and a desire to verify its accuracy. Thus, the jury was presented with relevant evidence aside from a mere allegation that Barrows obtained the Stewart report and mailed it without any investigation. As in *Harte-Hanks*, on the basis of the evidence presented and the testimony apparently believed by the jury, the jury in this case most certainly could have inferred that Barrows' decision not to confirm the accuracy of the report was motivated by a concern that doing so would raise additional doubts concerning its veracity. Therefore, we do not find the jury's credibility determinations clearly erroneous, and we agree with the jury's finding with regard to Barrows' liability.[55]

---

[55] The concurrence/dissent's claim that the Stewart report was available to the public under FOIA is inapposite to whether any of the defendants acted with actual malice. Moreover, the concurrence/dissent relies heavily on the fact that Barrows testified that he had no reason to investigate the veracity of the Stewart report. But it does not consider the central tenet of *St Amant*, 390 US at 732, that

> [t]he defendant in a defamation action brought by a public official cannot . . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in

23

## 3. FLOHE

In contrast to Stanek and Barrows, the evidence presented against Flohe is less convincing. Unlike for Stanek, there is no evidence indicating that Flohe was *ever* told that Stewart himself, as author of the report, confirmed that the report contained false information. In addition, unlike for Barrows, there is no evidence that VanHuystee had repeatedly informed Flohe that he had no knowledge of any illegal activity by plaintiff. Moreover, the evidence indicates that Flohe was not even present at the beginning of the meeting at which Preston expressed his reluctance to mail the report and indicated that he would verify its accuracy with Stewart. Thus, the record contains little, if any, evidence to counter Flohe's contention that he was unaware that the report contained false information. Accordingly, we conclude that while the jury apparently did not find Flohe's testimony to be credible, there was not clear and convincing evidence remaining to support its finding that Flohe acted with actual malice.

For these reasons, we reverse the Court of Appeals' conclusion that plaintiff presented insufficient evidence of actual malice as to Stanek and Barrows, but affirm its conclusion that plaintiff presented insufficient evidence of actual malice as to Flohe.

---

circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

24

## C.  DEFAMATORY MEANING OF HANDWRITTEN CAPTION

Defendants additionally argue that they are not liable for the added handwritten caption because the caption is not defamatory.[56]  The caption added to the Stewart report states, "<u>Attention</u>: Suttons Bay Villagers Alledged [sic] Misuse of Village Taxpayer Funds?" and "Derrick [sic] Smith" written next to the line stating, "Subject:  Personnel meeting scheduled for August 10, 2004."  The Court of Appeals conclusively determined that the caption alone is incapable of defamatory meaning as a matter of law because the term "alleged" was used and a question mark was included, indicating that the caption was nothing more than an expression of opinion.

However, we note that a statement of "opinion" is not automatically shielded from an action for defamation because "expressions of 'opinion' may often imply an assertion of objective fact."[57]  As explained by the United States Supreme Court, the statement "In my opinion Jones is a liar" may cause just as much damage to a person's reputation as the statement "Jones is a liar."[58]  If a statement of opinion is about a matter of public concern, it is protected speech under the First Amendment, unless it can be objectively proven to be false.[59]  Thus, a statement of opinion that can be proven to be false may be

---

[56] All defendants deny responsibility for writing the caption on the Stewart report and deny knowing who wrote it.  We note that this is irrelevant to our analysis, as defendants all admit to mailing the report and it is undisputed that the mailed copies include the handwritten caption.

[57] *Milkovich*, 497 US at 18.

[58] *Id.* at 18-19.

[59] *Id.* at 19-20.

defamatory because it may harm the subject's reputation or deter others from associating with the subject. The dispositive question with regard to the handwritten caption is whether a reasonable factfinder could conclude that the statement implies a defamatory meaning.[60]

The handwritten caption "<u>Attention</u>: Suttons Bay Villagers Alledged [sic] Misuse of Village Taxpayer Funds?" and "Derrick [sic] Smith" may be defamatory if it implies that defendants have information that would indicate a misuse of taxpayer funds by plaintiff. The Court of Appeals noted that the caption is phrased in a manner which asserts that any misuse of funds is only alleged, and it is punctuated with a question mark, indicating that defendants are not conclusively stating that plaintiff misused taxpayer funds.

Nevertheless, even a statement of opinion may be defamatory when it implies assertions of objective facts. Noting that context matters in analyzing an allegedly defamatory statement, the First Circuit has held that a statement must be examined "in its totality in the context in which it was uttered or published."[61] In addition, the First Circuit has explained that a court must consider all the words used in allegedly defamatory material, "not merely a particular phrase or sentence."[62] This Court has similarly supported the notion that "context" must be considered when an alleged

---

[60] See *id.* at 21.

[61] *Amrak Productions, Inc v Morton*, 410 F3d 69, 72-73 (CA 1, 2005).

[62] *Id*. at 73.

26

defamatory statement is reviewed for a determination of whether it implies a defamatory meaning.[63]

We agree that allegedly defamatory statements must be analyzed in their proper context. To hold otherwise could potentially elevate form over substance. Thus, on remand, the handwritten caption in this case should be viewed in context with the Stewart report as a whole, instead of relying merely on the use of a question mark as punctuation and use of the word "Alledged [sic]," to determine whether it is capable of defamatory meaning.

Finally, we note that the Court of Appeals failed to address the issue of the falsity of the handwritten caption. Such an inquiry is required for plaintiff to sustain her defamation claim, and must be addressed by the Court of Appeals on remand.

## IV. CONCLUSION

Plaintiff presented clear and convincing evidence to support the jury's finding that both Stanek and Barrows acted with actual malice. We reach this conclusion after conducting an independent review of the record and giving due regard to the ability of the finder of fact—the jury—to view the witnesses' demeanor and to make appropriate credibility judgments. The dissent's approach to the independent review function is

---

[63] See, e.g., *Gustin v Evening Press Co*, 172 Mich 311, 314; 137 NW 674 (1912) (noting that a publication must be considered as a whole when testing its libelous quality); *O'Connor v Sill*, 60 Mich 175, 181; 27 NW 13 (1886) (noting that an allegedly defamatory article must be read as a whole, without severing parts of it).

27

mistaken and reaches out to conduct essentially a de novo review in order to replace, with

the dissent's own, *all* of the jury's findings as to the defendants' liability.[64]

Therefore, we reverse the Court of Appeals' conclusion that Stanek and Barrows

are not liable for defaming plaintiff. However, we also conclude that the record does *not*

contain sufficient evidence to support the jury's finding that Flohe acted with actual

malice. Therefore, we affirm the Court of Appeals' conclusion that Flohe is not liable for

defaming plaintiff.

Accordingly, we remand this matter to the Court of Appeals for consideration of

defendants' additional arguments, including whether the added handwritten caption on

the Stewart report constitutes a non-defamatory statement of opinion when considered in

its context within the Stewart report as a whole, whether the caption is provable as false,

and whether defendants are entitled to the protection afforded by Michigan's statutory

fair reporting privilege.

---

[64] The dissent's approach does not acknowledge or apply the guidance provided by the United States Supreme Court and this Court regarding credibility determinations made by the fact-finder—the jury—in defamation cases. See *Bose Corp*, 466 US at 514 n 31. An appellate court should not conduct an independent review of credibility determinations, disregard findings of fact, or create new findings of fact. *Locricchio*, 438 Mich 84, 112 n 17. Credibility determinations made by the finder of fact must be examined to ascertain whether they are clearly erroneous. *Harte-Hanks*, 491 US at 688. The jury in this case was presented with conflicting testimony and was *required* to assess the credibility of the witnesses. Giving due regard to the jury's credibility determinations, we conclude that the evidence presented supports the jury's verdict with regard to Stanek and Barrows, but not with regard to Flohe.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

KELLY, C.J., and CAVANAGH and HATHAWAY, JJ., concurred with WEAVER, J.

# STATE OF MICHIGAN

## SUPREME COURT

DERITH SMITH,

      Plaintiff-Appellant,

v                                    No. 138456-8

ANONYMOUS JOINT ENTERPRISE,
GEORGE PRESTON, MARY BARROWS,
VILLAGE OF SUTTONS BAY, and
CHARLES STEWART,

            Defendants,
and

DONALD BARROWS, JOHN STANEK,
and NOEL FLOHE,

            Defendants-Appellees.

---

CORRIGAN, J. (*concurring in part and dissenting in part*).

In this defamation action, we consider whether the Court of Appeals erred by determining that plaintiff Derith Smith, a public official, failed to present clear and convincing evidence to support a finding of actual malice at trial. I concur with the majority that plaintiff did not satisfy her evidentiary burden regarding defendant Noel Flohe. I dissent, however, from the majority's conclusion that plaintiff presented clear and convincing evidence that defendants John Stanek and Donald Barrows acted with actual malice when they mailed copies of a public record—a report critical of plaintiff's job performance written by her former supervisor, Suttons Bay Village Manager Charles

Stewart. I would affirm the result reached by the Court of Appeals concerning each of the three individual defendants because my independent review of the record reveals that plaintiff failed to present clear and convincing evidence that Stanek and Barrows acted with actual malice.

## I. ACTUAL MALICE STANDARD

As the majority explains, to prevail in a defamation action, a plaintiff who is a public official must establish that a defendant made a false and defamatory statement with "actual malice."[1] "'Actual malice' exists when the defendant knowingly makes a false statement or makes a false statement in reckless disregard of the truth."[2] The Legislature codified the heightened actual malice standard in MCL 600.2911(6), which mandates that a plaintiff who is a public official sustain a defamation claim "by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false."[3] Clear and convincing proof is "evidence that 'produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear,

---

[1] *New York Times Co v Sullivan*, 376 US 254, 279-280; 84 S Ct 710; 11 L Ed 2d 686 (1964).

[2] *J & J Constr Co v Bricklayers & Allied Craftsmen, Local 1*, 468 Mich 722, 731; 664 NW2d 728 (2003), citing *New York Times*, 376 US at 280.

[3] MCL 600.2911(6) provides:

> An action for libel or slander shall not be brought based upon a communication involving public officials or public figures unless the claim is sustained by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false.

2

direct, and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.'"[4]

Application of the heightened actual malice standard in cases involving political speech reflects our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."[5]  This Court has distinguished between regulation of political speech and commercial speech, stating that:

> Political speech is "'at the core of our electoral process and of the First Amendment freedoms' . . . an area of public policy where protection of robust discussion is at its zenith."  Because the central purpose of the First Amendment speech clause is to protect core political speech, we determined that political speech may not be regulated in the same manner that commercial speech is regulated.[6]

"There is little doubt that 'public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the *New York Times* rule,' and the strongest possible case for independent review" of the actual malice determination.[7]

---

[4] *In re Chmura (After Remand)*, 464 Mich 58, 72; 626 NW2d 876 (2001), quoting *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995).

[5]  *New York Times*, 376 US at 270.

[6] *In re Chmura (After Remand)*, 464 Mich at 65, quoting *Meyer v Grant*, 486 US 414, 425; 108 S Ct 1886; 100 L Ed 2d 425 (1988).

[7] *Harte-Hanks Communications, Inc v Connaughton*, 491 US 657, 686-687; 109 S Ct 2678; 105 L Ed 2d 562 (1989), quoting *Ocala Star-Banner Co v Damron*, 401 US 295, 300; 91 S Ct 628; 28 L Ed 2d 57 (1971).

When determining whether a public official plaintiff has satisfied the heightened actual malice standard, "the reviewing court must consider the factual record in full."[8] The requirement of independent review "assigns to judges a constitutional responsibility that cannot be delegated to the trier of fact, whether the factfinding function be performed in the particular case by a jury or by a trial judge."[9] In *Locricchio v Evening News Ass'n*, this Court observed that the independent review requirement "reflects an inherent distrust of allocating unlimited decisional power to juries in the First Amendment context."[10] One year after *Locricchio*, this Court expanded its discussion about the importance of independent review, stating that "[w]e perceive an additional need for independent review grounded on the fear that juries may give short shrift to important First Amendment rights."[11]

In *New York Times Co v Sullivan*, the United States Supreme Court recognized that "erroneous statement[s] [are] inevitable in free debate, and that [these statements]

---

[8] *Harte-Hanks*, 491 US at 688; see also *Locricchio v Evening News Ass'n*, 438 Mich 84, 110; 476 NW2d 112 (1991), quoting *New York Times*, 376 US at 285 ("[*New York Times*] mandate[s] that reviewing courts . . . 'examine for [themselves] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect.'") (quotation marks omitted).

[9] *Bose Corp v Consumers Union of United States, Inc*, 466 US 485, 501; 104 S Ct 1949; 80 L Ed 2d 502 (1984).

[10] *Locricchio*, 438 Mich at 114 n 20.

[11] *Rouch v Enquirer & News of Battle Creek (After Remand)*, 440 Mich 238, 258; 487 NW2d 205 (1992). *Rouch* further observed that "[e]ven Justice Rehnquist, who dissented in *Bose, supra,* conceded that the doctrine of independent review of facts 'exists . . . so that perceived shortcomings of the trier of fact by way of bias or some other factor may be compensated for.'" *Id.*, quoting *Bose*, 466 US at 518.

4

must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'"[12] Absent such protection, "would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so."[13] That is, not protecting false defamatory statements would "dampen[] the vigor and limit[] the variety of public debate."[14] Because such an outcome cannot be tolerated under the First Amendment, "neither factual error nor defamatory content suffices to remove the constitutional shield from criticism of official conduct . . . ."[15] Instead, a plaintiff who is a public official must establish actual malice before recovering damages for a defamatory falsehood.[16]

The matters at issue here lie at the heart of our political discourse and are subject to the expansive protections enshrined in the First Amendment.[17] Nonetheless, the

---

[12] *New York Times*, 376 US at 271-272, quoting *NAACP v Button*, 371 US 415, 433; 83 S Ct 328; 9 L Ed 2d 405 (1963).

[13] *New York Times*, 376 US at 279.

[14] *Id*.

[15] *Id*. at 273.

[16] *Id*. at 279-280.

[17] The constitutional right guaranteeing the freedom of speech is embodied explicitly in both the United States Constitution and the Michigan Constitution. US Const, Am I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."); Const 1963, art 1, § 5 ("Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such

5

majority imposes liability on two of the three individual defendants because they failed to personally investigate information criticizing a political opponent contained in a public record. In so doing, the majority punishes defendants' exercise of their First Amendment rights to engage in political speech and to distribute a public record, contrary to well-established United States Supreme Court precedent.[18] Moreover, the majority shirks its "constitutional responsibility" to independently review the whole factual record,[19] and the majority also wrongly defers to the jury's verdict when such deference is not owed.[20]

## II. ACTUAL MALICE STANDARD AS APPLIED

In this case, all three individual defendants were politically active residents of Elmwood Township. Stanek, a township trustee from 1998 to 2004, survived a 2003 recall campaign in which plaintiff was involved. He lost his bid for reelection in 2004, and his slate was replaced by a group of candidates that included plaintiff. Flohe was the

---

right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press.").

[18] *Harte-Hanks*, 491 US 657; *Bose*, 466 US 485; *New York Times*, 376 US 254.

[19] *Bose*, 466 US at 501.

[20] The *Locricchio* Court explained:

"It is worth noting in this connection that the doctrine of independent review reflects an inherent distrust of allocating unlimited decisional power to juries in the First Amendment context. Thus, "much of contemporary first amendment doctrine, theory, and commentary is devoted to protecting speech *from* the jury. . . . The common wisdom is that if juries were given more decisional power in [First Amendment cases], either by increasing the range of issues they could consider or by granting juries greater immunity from appellate review, free speech would suffer a crippling blow." Schauer, *The role of the people in First Amendment theory,* 74 Cal L R 761, 765 (1986)." [*Locricchio*, 438 Mich at 114 n 20.]

6

township supervisor until plaintiff was elected to replace him in 2004. Barrows, another political opponent of plaintiff's, expressed his concern that plaintiff's job performance in Elmwood Township would be similar to her previous tenure as clerk in the Village. He sought information about plaintiff's track record in the Village from Jerry VanHuystee, Suttons Bay Village's appointed treasurer. VanHuystee furnished Barrows with the publicly available Stewart report, which criticized plaintiff's job performance in the Village. Indeed, the Stewart report caused plaintiff's termination from her position in the Village. Defendants subsequently mailed approximately 450 copies of the Stewart report to local residents, local government officials, and plaintiff. Before defendants mailed the Stewart report, someone had modified it with a handwritten caption, stating "<u>Attention</u>: Suttons Bay Villagers Alledged [sic] Misuse of Village Taxpayer Funds?" and "Derrick [sic] Smith."

Plaintiff received a copy of the Stewart report on May 17, 2005 and filed suit in July 2005. Plaintiff's suit proceeded to trial, and the jury returned a verdict in favor of plaintiff. The jury ordered that Stanek pay plaintiff $40,000 in noneconomic damages and $4,000 in campaign expenses and that Barrows pay plaintiff $45,000 in noneconomic damages and $4,000 in campaign expenses. By contrast, the jury only assessed $10,000 in noneconomic damages and $4,000 in campaign expenses against Flohe. However, the jury also mandated that each individual defendant publish a public apology to plaintiff in the form of a legal notice to appear in two local newspapers: the Traverse City Record-Eagle and the Leelanau Enterprise.

Although I generally agree with the majority's explication of the actual malice standard, I disagree with the majority's application of that standard to defendants Stanek and Barrows on this record. The record does not show "with convincing clarity"[21] that defendants acted with actual malice when they mailed the Stewart report. The "clear and convincing" evidentiary standard requires that plaintiff satisfy "the most demanding standard applied in civil cases."[22] After performing an independent review of the record, I cannot conclude that plaintiff satisfied this exacting standard. While plaintiff proffered some evidence of actual malice, that evidence is not "so clear, direct . . . weighty and convincing" that I can unhesitatingly state that either Stanek or Barrows acted with actual malice when they disseminated the Stewart report.[23]

Suttons Bay Village Manager Charles Stewart, plaintiff's former supervisor, drafted the report about plaintiff's tenure with the Village. Stewart addressed the report to the Village's personnel committee, which voted to terminate plaintiff after reviewing it. The Stewart report remained on file thereafter. In the report, Stewart stated that: (a) the Village hired plaintiff as an independent contractor, but plaintiff received benefits available to full-time employees although she had not received W-2 forms; (b) when the Village Council declined to reappoint plaintiff as clerk, she delayed responding to the

---

[21] See *Bose*, 466 US at 514 ("Appellate judges . . . must exercise independent judgment and determine whether the record establishes actual malice with convincing clarity.").

[22] *In re Martin*, 450 Mich at 227.

[23] *Id.*

8

Village's part-time job offer until Stewart was away from the office, at which time plaintiff directly contacted the Council president without Stewart's knowledge to authorize a higher pay rate; (c) plaintiff did not exert more than the minimum effort necessary to perform her job; and (d) plaintiff was not a "team player."

At trial, Stewart acknowledged that the report contained misinformation. For example, Stewart eventually located plaintiff's W-2 forms, which confirmed her status as an employee, rather than an independent contractor. However, Stewart testified that other aspects of the report were true, including his belief that plaintiff took purposeful steps to avoid a reduction in pay by directly contacting the Council president in his absence. Plaintiff did not dispute the basic facts involving her pay rate as described in the Stewart report. Nor did she dispute the specific facts surrounding the statements in the Stewart report that Stewart continued to maintain were true. Rather, plaintiff testified that she did not intend to circumvent efforts to lower her pay rate by directly contacting the Council president in Stewart's absence. In its decision regarding defendants' motions for summary disposition, the trial court held that "[t]he Stewart report was not a disciplinary report, was not required to be destroyed, and was subject to disclosure under FOIA." Plaintiff never appealed this adverse ruling.

## A. DEFENDANT JOHN STANEK

Plaintiff did not present clear and convincing evidence that defendant Stanek acted with actual malice. The testimony of retired police officer George Preston does not establish with convincing clarity that Stanek knew that the Stewart report contained defamatory falsities when he mailed it. Nor does Preston's testimony show that Stanek

9

recklessly disregarded its truth or falsity, i.e., that he "entertained serious doubts as to the truth"[24] of the Stewart report or mailed the Stewart report despite having a "high degree of awareness of [its] probable falsity."[25]

Preston testified that he attended an informal gathering of 10 or 12 people at Stanek's shop in early May 2005 "where some neighbors got together and were talking about current issues going on in Elmwood Township." At this gathering, copies of the Stewart report were distributed, and the attendees began discussing it. When Preston saw a copy of the Stewart report, he "became kind of interested, being a [retired] police officer." Preston volunteered to contact Suttons Bay Village Manager Charles Stewart and ask Stewart about "the contents of this information."[26] Preston wanted "to ensure that [Stewart] did type this and the information inside is what [Stewart] had put in." Preston testified that he waited a "[m]inimum [of] two weeks before I even talked to [Stewart] on the telephone." He also testified that Stewart never told him that the report

----

[24] See *St Amant v Thompson*, 390 US 727, 731; 88 S Ct 1323; 20 L Ed 2d 262 (1968) ("There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.").

[25] See *Garrison v Louisiana*, 379 US 64, 74; 85 S Ct 209; 13 L Ed 2d 125 (1964) (stating that "only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions.").

[26] When asked whether the other attendees heard him volunteer, Preston responded "[d]efinitely, yes." Barrows confirmed that he heard Preston say that he wanted to talk to Stewart, but Barrows did not think that he heard Preston make statements about not sending the report. By contrast, Stanek testified "I did not hear [Preston] say he was going to talk to Mr. Stewart," and Flohe testified that he also did not hear any talk about Preston contacting Stewart.

contained falsities. As a result, Preston never told anyone else, including Stanek, that the Stewart report contained falsities.[27] Instead, Preston told Stanek that the Stewart report had "no substance to it as far as the criminal aspect." Preston also informed Stanek that because there had been no criminal investigation, he personally "felt that it wasn't right to send that [report] out." Preston testified that he conveyed this message to Stanek at a monthly Elmwood Township meeting that occurred in "late spring, so that's May, June," but Preston did not recall the exact date of this conversation.[28]

Preston's testimony certainly does not establish with convincing clarity that Stanek acted with actual malice in disseminating the Stewart report. Although Preston

---

[27] Preston testified in pertinent part:

"*Q*. You hadn't received any information from Mr. Stewart that anything in the memo was false?

*A*. No, I did not.

*Q*. So you did not have any knowledge that anything in the memo was false, to convey to Mr. Stanek or anyone else, correct?

*A*. That's correct.

*Q*. And, in fact, when you pulled Mr. Stanek aside after this meeting, where he spoke at length, you did not tell him anything in the memo was false, correct?

*A*. That's correct."

[28] At trial, Preston vacillated about when he spoke with Stanek. When asked whether the conversation took place during the monthly Elmwood Township meeting in May 2005, Preston responded "I couldn't tell you what month it is, but I know it was in late spring." Preston later testified "I don't think it did go in the month of June. I think it was several weeks, so if that was May 2nd it would have probably been within the month of May."

11

told Stanek that the Stewart report had no substance "as far as the criminal aspect," Preston unambiguously testified that he never told Stanek or anyone else that the Stewart report contained falsities.[29]  Stewart confirmed that he "did not specify" to Preston what misinformation appeared in the report.  Stewart also testified that he never spoke with Stanek about the report and that he never attempted to inform Stanek that the report contained falsities.  The majority emphasizes Preston's concern with the "criminal aspect" of the Stewart report.  However, the Stewart report does not address whether plaintiff engaged in criminal activity or should be criminally prosecuted.  The five-page Stewart report does not contain the words "crime" or "criminal."  Stewart testified that the report discussed perceived ethical violations by plaintiff.  When asked whether he asserted that plaintiff had engaged in illegal conduct in the report, Stewart testified "I don't believe that's even in the memo."  In any event, Preston never told Stanek that the Stewart report contained falsities or that the veracity of the Stewart report had been called into question.  Instead, Preston informed Stanek of his personal opinion about the "criminal aspect" of the Stewart report.  Preston's act of volunteering to contact Stewart

---

[29] In response to another series of questions about his conversation with Stewart and his subsequent communication with others, Preston testified:

> "*Q*. Sure, exactly. But [Stewart] never told you there was anything false in that memo, did he?
>
> *A*. He did not.
>
> *Q*. As a consequence you never told anybody after that, anybody you talked to, about the conversation with Mr. Stewart. You never said to them, Mr. Stewart said there is something false in the memo?
>
> *A*. That's correct, I never said that."

and later sharing his personal opinion about the Stewart report with Stanek does not supply clear and convincing evidence that Stanek mailed the Stewart report with actual malice, i.e., either knowing the report contained defamatory falsities or recklessly disregarding its falsity.

Moreover, the testimony concerning the timeline of events is anything but clear and convincing. The majority deduces that the conversation between Preston and Stanek occurred at the monthly Elmwood Township meeting on May 9, 2005, and not the monthly Elmwood Township meeting on June 13, 2005. The majority reasons that because Preston spoke to Stanek on May 9 or before he mailed the Stewart report, Stanek mailed the Stewart report knowing that it contained defamatory falsities. Yet, Stanek testified with a firm recollection that this conversation occurred on June 13. Preston had no clear recollection of the date. But neither Preston nor Stanek testified in a manner that comports with the majority's dubious conclusion that the two men spoke on May 9— before the Stewart report was mailed.

It is undisputed that the informal gathering at Stanek's shop occurred during the first week of May 2005 and that plaintiff received the Stewart report in the mail on May 17, 2005. Several witnesses testified that the informal gathering at Stanek's shop occurred on May 2 or May 4. Preston testified that he waited a minimum of two weeks after the gathering before contacting Stewart. Preston further testified that after his telephone conversation with Stewart, he approached Stanek some time in "late spring, so

13

that's May, June."[30]  Thus, the earliest week in which Preston could have telephoned Stewart is the third week of May 2005—one week after the Elmwood Township meeting on May 9, 2005.  That is, under Preston's timeline of events, Preston telephoned Stewart no earlier than May 16 or May 18, 2005, and Preston shared his personal opinion with Stanek some time thereafter.  Consequently, Preston's testimony actually corroborates Stanek's recollection that the conversation took place on June 13, 2005.  If the conversation between Preston and Stanek occurred on June 13, Preston did not speak to Stanek until after defendants disseminated the Stewart report, and there is no basis to conclude, as the majority summarily does, that Stanek knew that the Stewart report contained defamatory falsities when he mailed it.  The actual testimony on the record, and not the majority's distortion of it, provides yet another basis to conclude that plaintiff did not present clear and convincing evidence that Stanek acted with actual malice.

The majority also accords great weight to Preston's testimony that Stanek initially denied responsibility for the anonymous mailing.  The majority's misplaced reliance on Preston's testimony about Stanek's initial denial of responsibility ignores the United States Supreme Court's observation that a defendant's repeated attempts to maintain that the inaccurate was accurate "does not establish that he realized the inaccuracy at the time of publication."[31]  Stanek's after-the-fact denial of responsibility for the mailing is

---

[30] Admittedly, Preston's testimony about when he spoke with Stanek varied.  See note 28 of this opinion.

[31] See *Bose*, 466 US at 512 ("[Defendant employee] had made a mistake and when confronted with it, he refused to admit it and steadfastly attempted to maintain that no

14

irrelevant in determining whether plaintiff presented clear and convincing evidence that Stanek acted with actual malice when he mailed the Stewart report.

## B.  DEFENDANT DONALD BARROWS

I also reject the majority's conclusion that plaintiff presented clear and convincing evidence that defendant Barrows acted with actual malice.  The majority concedes that Barrows did not know that the Stewart report contained defamatory falsities at the time of its dissemination.[32]  Therefore, the salient issue is whether plaintiff presented sufficient evidence to support a finding that Barrows recklessly disregarded the truth or falsity of the Stewart report.  My independent review of the record reveals that plaintiff did not establish with convincing clarity that Barrows mailed the Stewart report "with reckless disregard of whether or not it was false."[33]

The majority relies on the testimony of Suttons Bay Village Treasurer Jerry VanHuystee to conclude that Barrows acted with actual malice.  VanHuystee furnished the Stewart report to Barrows.  However, VanHuystee's testimony does not establish with convincing clarity that Barrows acted with reckless disregard in disseminating the Stewart report.  VanHuystee testified that as the appointed Village treasurer, he never

---

mistake had been made—that the inaccurate was accurate.  *That attempt failed, but the fact that he made the attempt does not establish that he realized the inaccuracy at the time of publication*.") (emphasis added).

[32] When the trial court issued its bench ruling on Barrows' motion for a directed verdict, the court concluded that although the evidence permitted "an inference" that Barrows acted with reckless disregard, there was no evidence that Barrows had actual knowledge of falsity.  Plaintiff did not appeal this adverse ruling.

[33] MCL 600.2911(6).

15

supervised plaintiff; moreover, he was not in contact with anyone who did supervise plaintiff. As the majority notes, Barrows asked VanHuystee at least five times whether plaintiff had engaged in illegal conduct during her tenure with the Village. VanHuystee repeatedly responded that "as far as I know [plaintiff] hadn't done anything illegal," but VanHuystee also specifically told Barrows that he had no idea.[34] VanHuystee also testified that he did not even know that the Stewart report existed when he responded to Barrows' questions about plaintiff. Significantly, VanHuystee never testified that he told Barrows that the Stewart report contained falsities or that it merited further investigation based on VanHuystee's review of the document. To the contrary, VanHuystee testified that he only procured a copy of the Stewart report "to stop [Barrows] from asking me" about plaintiff. Additionally, no evidence explains why VanHuystee, a disinterested party, would furnish the Stewart report to Barrows if VanHuystee doubted its veracity. Consequently, I cannot conclude that VanHuystee's testimony clearly established that Barrows mailed the Stewart report with reckless disregard of its falsity.

---

[34] VanHuystee testified in pertinent part:

"*Q.* So when you say that Mr. Barrows asked you whether [plaintiff] had done anything illegal you didn't know one way or another, did you?

*A.* That's correct.

*Q.* You told him, I don't know of anything she did illegal?

*A.* That's correct.

*Q.* But you also told him I don't have any idea?

*A.* That's correct."

16

The majority's reliance on Preston's testimony to establish that Barrows mailed the Stewart report with actual malice is similarly misplaced. Barrows testified that he heard Preston say that he wanted to talk to Stewart during the informal gathering at Stanek's shop, but Barrows also testified that he did not think he heard Preston say "don't send the memo." Preston further testified that the only defendant with whom he spoke after his conversation with Stewart was Stanek. He never spoke to Barrows. Moreover, Preston testified that he had no knowledge of any falsities in the Stewart report, and as a result, he never told anyone else, including Barrows, that the Stewart report contained falsities. Stewart confirmed that he, too, had no contact with Barrows about the report before the mailing. The majority's reliance on Preston's testimony is misplaced because nothing in Preston's testimony demonstrates that Barrows "in fact entertained serious doubts as to the truth of his publication"[35] or that Barrows mailed the Stewart report with the requisite "high degree of awareness of [its] probable falsity."[36]

I also disagree with the majority's perplexing assertion that Barrows' testimony reveals his "purposeful avoidance of the truth" consistent with *Harte-Hanks Communications Inc v Connaughton*, 491 US 657; 109 S Ct 2678; 105 L Ed 2d 562 (1989). In *Harte-Hanks*, the United States Supreme Court concluded that "[a]lthough failure to investigate will not alone support a finding of actual malice, the purposeful

---

[35] *St Amant*, 390 US at 731.

[36] *Garrison*, 379 US at 74.

avoidance of the truth is in a different category."[37]  The majority suggests that Barrows purposefully avoided the truth because he did not contact Stewart directly.  In so doing, the majority conflates Barrows' failure to investigate with the "purposeful avoidance of the truth" illustrated by the unique facts in *Harte-Hanks*.

In *Harte-Hanks*, the defendant newspaper gathered the facts that were ultimately reported; drafted the offending statements; actually heard from the plaintiff himself and five other witnesses that the offending statements were untrue; failed to examine evidence in the defendant's possession corroborating plaintiff's story; and opted not to contact the key witness in the story it was creating, although it contacted the other parties involved.  As the Supreme Court explained, "[i]t is utterly bewildering in light of the fact that the Journal News committed substantial resources to investigating Thompson's claims, yet chose not to interview the one witness who was most likely to confirm Thompson's account of the events."[38]  "By the time the November 1 story appeared, six witnesses had consistently and categorically denied Thompson's allegations, yet the newspaper chose not to interview the one witness that both Thompson and Connaughton claimed would verify their conflicting accounts of the relevant events."[39]  In addition, the defendant newspaper had in its possession tapes that would have either verified or disproved its story and yet did not listen to these tapes before publishing its story.

---

[37] *Harte-Hanks*, 491 US at 692 (citation omitted).

[38] *Id.* at 682.

[39] *Id.* at 682-683.

In stark contrast to the defendants in *Harte-Hanks*, defendants here distributed a public record prepared by a government official in the course of his duties and available to the public under FOIA; defendants were never told by anyone that the contents of the report were untrue; they were not given any reason to believe that the contents of the report were untrue; and they did not fail to view evidence in their possession that indicated that the contents of the report were untrue. No evidence whatsoever reflects that Barrows entertained serious doubts about the veracity of the Stewart report before its publication or that he mailed the Stewart report with a high degree of awareness of its probable falsity. In fact, Barrows testified that he had no reason to investigate the Stewart report because he recognized that it came from a reliable source. When asked whether he would have treated the Stewart report differently if its origins appeared dubious, Barrows responded, "Certainly. You couldn't pay any credence to it." In this case, however, Barrows reiterated that "[t]he copy came to me through a reliable source, Mr. VanHuystee" and that "I had no doubt it was reliable."

Finally, it is axiomatic that the mere failure to investigate before publication will not support a finding of reckless disregard.[40] In the same fashion, the mere fact that Preston expressed his hesitance about mailing the Stewart report and chose to contact Stewart does not impose a similar requirement on Barrows because reckless disregard is "not measured by whether a reasonably prudent man would have published, or would

---

[40] *Id.*; see also *St Amant*, 390 US at 731 ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing.").

19

have investigated before publishing."[41]  Under these facts, plaintiff did not present clear and convincing evidence that Barrows either attempted to purposefully avoid the truth or that Barrows mailed the Stewart report in reckless disregard for its falsity.

### III.  CONCLUSION

After independently reviewing the record, I cannot conclude that plaintiff presented clear and convincing evidence that either Stanek or Barrows acted with actual malice in disseminating the Stewart report.  There is no evidence that either defendant knew about the misinformation contained in the Stewart report regarding plaintiff's status as an employee, her W-2 forms, and her right to employee benefits when they mailed this public record.  Accepting that Stanek and Barrows were political opponents who bore ill will toward plaintiff and knew that she had not been criminally prosecuted for any improprieties during her tenure in Suttons Bay Village, the record contains no evidence that either defendant entertained serious doubts about the truth of the Stewart report.  Accordingly, I would affirm the result reached by the Court of Appeals concerning each of the three individual defendants.

YOUNG and MARKMAN, JJ., concurred with CORRIGAN, J.

---

[41]  *St Amant*, 390 US at 731.