# STATE OF MICHIGAN

# COURT OF APPEALS

TWILA C. LEIGH,

      Plaintiff-Appellant,

v

ALPHA KAPPA ALPHA SORORITY, INC.,
CHARLENE TRUITT NELSON, CASSANDRA
LEWIS, and ANTONIA WATKINS,

      Defendants-Appellees.

UNPUBLISHED
October 6, 2015

No.  323677
Oakland Circuit Court
LC No.  2013-137113-NZ

Before:  GLEICHER, P.J., and SAWYER and MURPHY, JJ.

PER CURIAM.

Plaintiff Twila Leigh felt aggrieved when her sorority withdrew her membership rights and interrupted her term as local chapter president during an investigation into hazing and improper chapter operations.  Leigh was further offended when the sorority's investigation led to new elections for chapter leadership, and the chapter's membership did not reelect her.  She filed suit against the sorority, the sorority's regional director, her sorority chapter's prior president, and a chapter member who had lodged a complaint against her, charging a series of contractual breaches, negligent actions, fraudulent misrepresentation, conspiracy, and defamation that allegedly caused her financial and emotional harm.  The circuit court summarily dismissed Leigh's claims, discerning that some were legally insupportable and that Leigh had presented insufficient evidence to create triable issues of material fact as to others.  We affirm.

## I. BACKGROUND

Leigh is a longtime member of Alpha Kappa Alpha Sorority (AKA).  Leigh continued her membership after college in AKA's Southfield chapter of Pi Tau Omega (PTO), a service-oriented group of professional women.  In 2012, Leigh was elected to serve as PTO's vice president/president elect for a two-year term beginning January 1, 2013.  According to PTO bylaws, the elected vice president immediately serves a two-year term as chapter president following her vice presidency.  Leigh was to serve as vice president under Cassandra Lewis.

In the summer of 2012, while still acting as vice president, Lewis stopped attending general and mandatory committee meetings.  In October 2012, Lewis told the acting president that she was on temporary work assignment in North Carolina.  Lewis further stated that she would know the status of her employment before the time arose to take her oath of office, and

-1-

that she would not accept the presidency if she could not fulfill her duties. On December 13, 2012, Lewis took the oath as president, and Leigh as vice president. On January 9, 2013, Lewis announced her appointment of various committee chairs, as was her right as PTO president. Two days later, Lewis announced that she had accepted a permanent position in North Carolina and resigned as PTO president.

Leigh ascended to the presidency. Her first act was to request the resignation of Lewis's appointed committee heads. Complaints were made to AKA leadership and Charlene Truitt Nelson, the regional director for AKA's Great Lakes area, intervened. Following a special meeting with Nelson, PTO members were ordered to participate in a sisterhood-building workshop. At that workshop, Leigh argued with Protocol Committee Chair, Antonia Watkins. Leigh then appointed two committee "cochairs" to circumvent Watkins's authority. In March 2013, Watkins filed a complaint with Nelson, asserting that Leigh bullied and "hazed" her, as well as describing the negative tenor of their working relationship.

Nelson did not immediately act upon Watkins's complaint. Other concerns were apparently brought to Nelson's attention, however, and on August 7, 2013, Nelson initiated an investigation into complaints of hazing and improper chapter operations against Leigh and PTO. Pending the investigation, Nelson withdrew the membership rights of Leigh and PTO, preventing the sorority chapter from meeting. Nelson appointed a "Standards Investigation Team Evaluators," or SITE team, to investigate the complaints. Over the following 5-1/2 months, the SITE team interviewed PTO members and reviewed chapter documents. The team ultimately determined that improprieties had occurred during the chapter's elections and severe irregularities in chapter operations were pervasive. Nelson reinstated Leigh's and PTO's membership rights, but ordered extensive training in proper AKA procedure and relationship building. Nelson determined "that the chapter is profoundly divided," and ordered new elections to remedy the rift. Leigh ran for reelection but was defeated.

In the midst of the SITE team investigation, Leigh filed suit. She accused Lewis of fraudulently misrepresenting her intent to remain in Michigan and fulfill her duties as PTO president in order to install her friends in leadership positions. Leigh accused AKA and Nelson of breaching contractual duties set forth in various AKA governing documents by failing to conduct the SITE team investigation in a timely and proper manner. Leigh contended that AKA's and Nelson's conduct of the investigation was also negligent. Leigh alleged that Nelson and Lewis conspired to remove Leigh from her position as president. Leigh further charged Watkins with defaming her at an AKA-sponsored breakfast, by publicly broadcasted that Leigh had hazed her.[1]

Ultimately, the circuit court summarily dismissed Leigh's complaint in its entirety. This appeal followed.

---

[1] Leigh also raised claims for declaratory judgment and injunctive relief, and accused Nelson and AKA of violating her due process rights. Leigh has since abandoned those claims and we do not consider them on appeal.

## II. STANDARD OF REVIEW

We review de novo a circuit court's resolution of a summary disposition motion. *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013).

A motion under MCR 2.116(C)(8) "tests the legal sufficiency of the complaint on the basis of the pleadings alone to determine if the opposing party has stated a claim for which relief can be granted." We must accept all well-pleaded allegations as true and construe them in the light most favorable to the nonmoving party. The motion should be granted only if no factual development could possibly justify recovery.

A motion under MCR 2.116(C)(10) "tests the factual support of a plaintiff's claim." "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." "In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." [*Id.* at 139-140 (citations omitted).]

## III. ANALYSIS

Although Leigh was displeased by the chain of events that plagued her short run as PTO president, we agree with the circuit court that she failed to raise actionable claims or create triable fact issues for a jury's consideration.

### A. BREACH OF CONTRACT AND NEGLIGENCE

Leigh first alleged that AKA and Nelson violated their investigative duties as described in AKA's Constitution and Bylaws, Manual of Standard Procedures (MSP), and a handbook entitled *Say No to Hazing*. Leigh contends that hazing was not at issue in this case because hazing occurs only during the membership intake process, while Watkins had been an AKA member for several years. As hazing was not involved, Leigh asserts that AKA and Nelson were not permitted to withdraw her membership privileges pending the investigation. And if hazing were involved, AKA and Nelson breached their contractual duties to complete the investigation as described in the handbook.

The AKA governing documents at issue in this case form a contract between the sorority and its members. We review de novo questions of contract interpretation. *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003).

In interpreting a contract, it is a court's obligation to determine the intent of the parties by examining the language of the contract according to its plain and ordinary meaning. If the contractual language is unambiguous, courts must interpret and enforce the contract as written, because an unambiguous contract

reflects the parties' intent as a matter of law. [*In re Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008) (citations omitted).]

Leigh is correct that hazing was not at issue in this case. AKA's Constitution and Bylaws and the *Say No to Hazing* handbook define "hazing" as conduct "not limited to physical acts such as hitting, striking, laying hands upon or threatening to do bodily harm to any individual(s) while acting in one's capacity as a member of [AKA], behavior which is directed against any individual(s) for the purpose of causing shame, abuse, insult, humiliation, intimidation or disgrace." Examples include "underground hazing," "financial hazing," "pre-pledging," "post-pledging," or "post-initiation pledging" hazing. The documents strictly prohibit hazing "in any form." The handbook also defines the "scope" of the sorority's anti-hazing policy:

> Prospective members of [AKA], both graduate and undergraduate, have the right to be treated fairly, with dignity and respect, before, during, and after the official Membership Intake Process. This policy shall apply to all members of [AKA] who engage in hazing activities. Any prospective member of [AKA] subjected to any form of hazing or anyone having knowledge of hazing activities within [AKA] must file a written complaint with the Regional Director pursuant to the Procedure to Implement Anti-Hazing Policy.

The theme running through these provisions is that AKA sorority forbids mistreatment of prospective and newly selected members. The Constitution and Bylaws and handbook use examples of "pre-pledging," "post-pledging," "post-initiation pledging," and "undergraduate hazing." The handbook asserts the right of prospective members to be treated fairly and with dignity before, during, and after the membership intake process. These provisions read together provide guidelines for the proper treatment of new members, from the potential pledges' first contact with sorority members through the initiation process and into their days as "newbies" in the sorority. That the documents decry hazing "directed against any individual(s)" does not alter the fundamental nature of the conduct forbidden. Watkins had been a member of a post-graduate professional chapter of AKA for several years. Accordingly, despite Watkins's characterization of her complaint, hazing was not at issue.

The absence of hazing did not preclude AKA and Nelson from withdrawing Leigh's membership rights pending the investigation. The MSP provides that the regional director may initiate an action and withdraw the privileges of a member "who violates the *Constitution and Bylaws*." Moreover, the Constitution and Bylaws imposes upon the regional director "the duty . . . to exercise general supervision over the chapters of her region" and grants her "the power to address problems in her region." Withdrawing the membership rights of an individual and a chapter pending an investigation into complicated and severe chapter mismanagement falls within the ambit of "address[ing] problems in her region." Accordingly, Leigh's challenge in this regard is without merit.

Leigh further asserts that AKA and Nelson conducted the investigation in a negligent manner. Leigh cites the *Alpha Kappa Alpha Sorority, Incorporated Investigation Guide*, upon which Nelson and the SITE team were bound to base their task. Leigh contends that the Guide is not part of the parties' contract because it is available only to AKA management. The duties created by the guide are therefore separate from the contract, Leigh avers, forming a distinct duty

whose breach may form the basis of a tort claim. This interpretation is insupportable. The Constitution and Bylaws created AKA's and Nelson's duty to investigate member and chapter violations. The guide merely provides a fuller picture of that duty. Nelson's and AKA's promise to conduct a fair investigation arose from the contract and cannot support a separate tort action. See *Rinaldo's Constr Corp v Mich Bell Tel Co*, 454 Mich 65, 83-84; 559 NW2d 647 (1997); *Hart v Ludwig*, 347 Mich 559, 563-565; 79 NW2d 895 (1956).

Leigh failed to create a triable issue of material fact relating to AKA's and Nelson's conduct of the investigation as proscribed by the guide. Leigh contends that Nelson failed to adequately detail the allegations raised against her in the SITE team appointment letter as required by *Guide* ¶ 4.1. Nelson complied with her duty by attaching the hazing complaint form and accompanying email submitted by Watkins. Leigh contends that Nelson breached her duty to appoint team members who could quickly conduct the investigation "unhampered by other commitments." Yet, Leigh presented no evidence that the length of the investigation was caused by the team members' schedules.

The only possible contractual breach presented by Leigh pertains to the length of the investigation as governed by *Guide* ¶ 2.3, which provides that most investigations should be completed within 45 days and that "SITE members should request and justify extensions in writing." There is no evidence that the team requested or justified its extension request in writing. However, Leigh failed to support her claim that she was injured by this delay. Leigh's membership rights were reinstated and although she lost her presidency, this was the result of an election and not investigatory delay. Leigh's loss of the financial reimbursements owing to a chapter president was similarly caused by the election. While Leigh contended that the investigation delay affected her relationships with other sorority members, because the delay lent credence to the allegations and rumors, she could cite no examples of individuals with whom her relationship was lost or strained. Leigh further failed to support her claim of stress-induced health effects with any evidence of new or worsening conditions.

Ultimately, absent any duty separate from that created by contract, the circuit court correctly dismissed Leigh's negligence claim. And without proof of any contractual breach that caused Leigh damage, the court properly dismissed her breach of contract claim as well.

## B. FRAUDULENT MISREPRESENTATION

Leigh accused Lewis of fraudulently misrepresenting that she would not be moving to North Carolina and that she would not take the oath of office knowing she could not fulfill her duties as PTO president. As a result of these falsehoods, Leigh contended that she lost the ability to appoint her own committee heads. The chain of complaints and ultimate investigation occurred, Leigh asserts, because she was saddled to Lewis's uncooperative leadership team. The circuit court dismissed Leigh's complaint because Lewis's comments related to future performance, which create a contract rather than tort action, and Leigh failed to establish current bad faith necessary to support a tort action.

Our Supreme Court outlined the elements of fraudulent misrepresentation, also known as actionable fraud, as follows:

> The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery. [*Titan Ins Co v Hyten*, 491 Mich 547, 555; 817 NW2d 562 (2012) (quotation marks and citations omitted).]

"[A]n action for fraudulent misrepresentation must be predicated upon a statement relating to a past or an existing fact. Future promises are contractual and do not constitute fraud." *Hi-Way Motor Co v Int'l Harvester Co*, 398 Mich 330, 336; 247 NW2d 813 (1976). See also *Lawrence M Clarke, Inc v Richco Constr, Inc*, 489 Mich 265, 284; 803 NW2d 151 (2011). A plaintiff can avoid this bar, however, by establishing that the declarant had the present intent not to fulfill her promises at the time the statements were made. *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 378-379; 689 NW2d 145 (2004).

Even if Leigh presented evidence that Lewis harbored ill intent when she made her statements in October 2012, Leigh could not support her claim. Leigh cannot connect the dots between the initial action—Lewis's October 2012 promise not to take the oath of office if she could not fulfill her role as president—and Leigh's ultimate injury—loss of her position as PTO president. Nelson withdrew Leigh's membership privileges because Watkins complained of hazing and because various other complaints of chapter mismanagement had been lodged. An investigation revealed chapter improprieties so severe that restructuring and new elections were required. Leigh ran for president but the chapter members chose not to elect her. There is no evidence that Leigh was the subject of an investigation because of events Lewis set into place. Rather, the evidence is that several complaints of various chapter misdeeds led to the investigation. And Leigh lost her position not because Lewis may have lied, but because the PTO membership no longer wanted her for president. Absent evidence supporting the chain of causation, the circuit court properly dismissed Leigh's fraudulent misrepresentation claim.

### C. DEFAMATION

Leigh accused Watkins of defaming her by telling other attendees at an AKA breakfast in June 2013 that Leigh had hazed her.

> A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. Generally, to sustain a claim of defamation, the following elements must be established:
>
> > (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Smith v Anonymous Joint*

> *Enterprise*, 487 Mich 102, 113, quoting *Mitan v Campbell*, 474 Mich 21, 24; 706 NW2d 420 (2005) (other quotation marks and citations omitted).]

"At common law, words charging the commission of a crime are defamatory per se, and hence, injury to the reputation of the person defamed is presumed to the extent that the failure to prove damages is not a ground for dismissal." *Burden v Elias Bros Big Boy Restaurants*, 240 Mich App 723, 727-728; 613 NW2d 378 (2000).

Hazing is a crime in Michigan, not just an action forbidden by AKA documents. See MCL 750.411t. Accordingly, Leigh contended that Watkins's statements were defamatory per se and that she was not required to establish damages. Leigh's alleged conduct does not fall within the statutory definition of hazing and therefore no charges could have arisen even if her conduct were proven. The parties disagree whether a defamation per se claim may stand where the plaintiff's conduct does not fall within the statutory ambit. We need not resolve that legal issue in this case, however, because Leigh failed to factually support her defamation claim.

In the complaint, Leigh generically alleged that "at the 2013 June Breakfast of Alpha Rho Omega Chapter of" AKA, Watkins "stated that Plaintiff hazed her." During her deposition in April and May 2014, Leigh was unable to describe what Watkins said or to whom. By the time she filed her supplemental witness list in August 2014, Leigh was still only able to identify "Individuals seated at the table with Defendant Antonia at Alpha Rho Omega's June breakfast 2013 address unknown." Leigh had ample opportunity to locate these people and knew that defendants were searching for the information. Yet, Leigh never asked her fellow PTO members if they were witnesses to Watkins's comments despite admitting that this affair has been a major topic of conversation among the women since the chapter reconvened. As Leigh completely failed to support her claim, the court properly dismissed it.

## D. CONSPIRACY

Leigh accused Lewis and Nelson of conspiring to ruin and then end her presidency. "A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins Co v Brochert*, 194 Mich App 300, 313; 486 NW2d 351 (1992). "[T]he plaintiff must establish some underlying tortious conduct." *Urbain v Beierling*, 301 Mich App 114, 132; 835 NW2d 455 (2013). As aptly noted by the circuit court, absent a viable claim of negligence or fraudulent misrepresentation, Leigh's conspiracy claim had to be dismissed.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ David H. Sawyer
/s/ William B. Murphy