*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DAVID GERSENSON, LEELANAU PENINSULA
CURLING CLUB, LLC, CURLING FOUNDATION
OF NORTHERN MICHIGAN, and 172, LLC,

UNPUBLISHED
March 25, 2025
1:49 PM

Plaintiffs-Appellants,

v

No. 367228
Leelanau Circuit Court
LC No. 2023-010995-NO

WTCM RADIO, INC., MIDWESTERN
BROADCASTING COMPANY, and RONALD
JOLLY,

Defendants-Appellees.

Before: CAMERON, P.J., and GARRETT and MARIANI, JJ.

PER CURIAM.

In this defamation action, plaintiffs appeal as of right the trial court's order granting defendants' motion for summary disposition under MCR 2.116(C)(10). We affirm.

## I. BACKGROUND[1]

Plaintiff David Gersenson is the sole member of plaintiffs Leelanau Peninsula Curling Club, LLC, and 172, LLC. Plaintiff Curling Foundation of Northern Michigan is a nonprofit corporation. Defendants WTCM Radio, Inc., and Midwestern Broadcasting Company own and operate "WTCM NewsTalk 580," which airs, among other shows, "The Ron Jolly Show"—hosted by defendant Ronald Jolly.

Gersenson is an entrepreneur who, in 2016, became interested in the sport of curling. He purchased a property in Leelanau County and opened the Broomstack Kitchen and Taphouse in early 2019. On the same property, Gersenson also built a new curling facility, which Leelanau

---

[1] For purposes of their motion for summary disposition, defendants relied on many of plaintiffs' allegations from their complaint. We will do the same.

-1-

Peninsula Curling Club operates. Prior to this business venture, Gersenson was a member of the Traverse City Curling Club (TCCC), which curled at Centre Ice Arena until 2022. In 2021, TCCC announced plans to construct a new curling facility from the ground up, but these plans were later abandoned. Instead, in 2022, TCCC announced that it had purchased a large building in a Traverse City shopping center and planned to renovate it into a curling facility. The budget for the renovation was around $7 million and TCCC stated publicly that it would need to raise money through gifts and pledges to reach its goals. Shortly after TCCC's announcement, it received a $2 million grant from the state to help build the curling facility. The grant frustrated Gersenson, who believed that the area could not sustain two dedicated curling facilities.

In November 2022, the Michigan Capitol Confidential published an article about the $2 million state grant, referring to it as a "pork project" that brought taxpayer dollars to the district "for elected officials to spend on favored enterprises." The article also reported that TCCC's membership had been "flat" and that TCCC did not expect to see strong growth once the facility was constructed. Following the article, a Michigan Capitol Confidential reporter asked to interview Gersenson for a forthcoming second article about the grant. Gersenson agreed, and, in preparation for the article, reached out to the then-president of TCCC's board of directors, Kevin Byrne, to discuss how TCCC secured the grant. According to plaintiffs, Byrne told Gersenson that the grant was given due to "multi-decades relationships" between Byrne and members of the state government and that there had been no formal application process. On January 27, 2023, the Michigan Capitol Confidential published a second article about the grant to TCCC, which included quotes from Gersenson.

According to plaintiffs, Gersenson, desiring to raise public awareness, sought a public forum to discuss the grant and its effect on his business. He contacted WTCM NewsTalk 580, a conservative radio network, because he believed that it would be sympathetic to his plight and critical of the grant. Gersenson had previously been interviewed by Vic McCarty, who made regular appearances on "The Ron Jolly Show." On January 2, 2023, Gersenson reached out to McCarty about "the pork belly grant [TCCC] received and the competitive disadvantage place we now are." McCarty invited Gersenson to do a couple of live interviews from his curling facility on January 4, 2023 for "The Ron Jolly Show," which Gersenson accepted. Ahead of the interview, Gersenson and his business manager, Benjamin Bryant, prepared notes regarding what Gersenson wanted to say which, according to plaintiffs, "included extensive discussion of TCCC's grant." Gersenson sent the notes to McCarty and "made his intent to discuss the grant very clear." Bryant and Gersenson later converted the notes into a script.

The day before the interview, Gersenson ran an advertising campaign on Facebook to attract attention to the upcoming interview. The advertised post provided:

> Tune in to the Ron Jolly show on 580 WTCM tomorrow at 7:30am when I'll be on the air with Vic McCarty discussing what's new at the Leelanau Curling Club, including the challenges that lay ahead as the [TCCC] prepares to open their new facility and compete with us, fueled with $2,000,000 of taxpayer money.

This post was published more than 10,000 times.

Gersenson's interview with "The Ron Jolly Show" was split into two segments, with McCarty interviewing Gersenson on-site while Jolly was in the radio station. In the first segment, Gersenson began with a general discussion about curling but then pivoted to discussing the TCCC and Gersenson's concerns about retaining business in light of TCCC's new facility. In the second segment, Gersenson quickly turned his focus to the grant. Gersenson described the grant as "classic pork barrel politics, where the grant was the result of a decades' long relationship with lawmakers in Lansing" and TCCC. Gersenson was also critical of TCCC's alleged plans to sell portions of the property to other developers. Gersenson remarked:

> But let's be clear about what [TCCC] is building. Only 50% of their total budget is actually being used for curling-related expenses. The remainder is being leveraged through a series of real estate transactions. In all, only a third of the interior square footage of the Kmart building they purchased for the facility is dedicated to the curling facility. The remaining 55,000 square feet is going to be leased to other businesses. So now not only is [TCCC] a commercial landlord, it's also selling portions of the extensive parking lot surrounding the Kmart building to developers.
>
> As you know, *there's been a number of new buildings that have sprung up there in the recent past, including a Wendy's and a Biggby Coffee. You can expect more as the club in Traverse City has announced the sale of another lot in the parking lot.* So what's being sold as a nonprofit curling club in reality is a . . . very sophisticated enterprise more dedicated to generating revenue than curling, so that it can fund this behemoth facility. [Emphasis added.]

After the interview concluded, McCarty sent the show back to Jolly. Jolly made the following remarks, which included the allegedly defamatory statement at issue in this case:

> Well, it sounds like there is some bitterness there I can understand, having to compete against a nonprofit that gets a government grant. But just for clarification, . . . my understanding is [TCCC] has part of that old mall building, not the outlots. That Wendy's that he mentioned was there, open before I think they took ownership of that part of the building. The state grant that was given to them came after (sic) they bought that building. They, as a nonprofit, had rounded up investors—backers—so it was all out there on a positive note.

* * *

> [TCCC] saying, "This is great, people like it, we want to get bigger, we want to develop. And here's a property, we have investors that believe in us, we're going to buy it." The state came along after that and threw the money in the pot for them to continue. *So I understand Mr. Gersenson's concerns, but I'd say he's got a good thing going there and we wish him the best but no need to make things up.* All right, but it was good to get a look at his business. As you say, he's been there for a few years now offering two sheets of curling in Leelanau County, in little ole Maple City. [Emphasis added.]

-3-

Jolly's statement—"no need to make things up"—is the basis of the instant lawsuit. It is undisputed that TCCC did not sell the lots in question to Wendy's or Biggby Coffee. Plaintiffs take the position that Gersenson stated accurate information regarding the sale of the lots, while defendants argue that, in context, Gersenson's statements could reasonably be interpreted as incorrectly implying that TCCC sold the lots to Wendy's and Biggby Coffee.

According to plaintiffs, immediately after the interview, Gersenson asked McCarty why Jolly had been so aggressive. McCarty allegedly told Gersenson that Jolly was "pretty tight" with the founder of TCCC, Donald Piche. Plaintiffs also allege that Jolly and Piche are personal friends and that, a few days after the interview, Gersenson spoke with Piche, who told Gersenson that he had had a conversation with Jolly the day before the radio interview.

The day after the interview, Bryant sent an e-mail to McCarty expressing disappointment with Jolly's statement about "mak[ing] things up." Bryant explained that Gersenson was not trying to imply that TCCC sold the lots in question to Wendy's or Biggby Coffee and instead was paraphrasing information that Gersenson and Bryant pulled from an article published by a local news organization regarding new businesses in the area. Bryant included a link to the article and asked that Gersenson be allowed to return to the show to correct the record. After communication broke down, plaintiffs' counsel sent a formal letter to defendants arguing that Jolly's statement constituted defamation, demanding a retraction, and threatening litigation. Plaintiffs subsequently initiated this action with a two-count complaint, alleging defamation and tortious interference with a business expectancy.

In lieu of an answer, defendants moved for summary disposition under MCR 2.116(C)(10), arguing that Jolly's statement that there was "no need to make things up," when viewed in context, was merely an attempt to clarify Gersenson's statements about the Wendy's and Biggby Coffee lots and to express Jolly's own opinion about the perceived inaccuracy of those statements. According to defendants, Jolly's statement was not a provable falsehood about Gersenson; rather, it was a rhetorical comment on Gersenson's inaccurate statements. Additionally, defendants argued that Gersenson was a limited-purpose public figure because he intentionally inserted himself into a public controversy, namely TCCC's receipt of the $2 million state grant. This meant that plaintiffs needed to show actual malice, and defendants contended that plaintiffs could not do so because they had failed to plead or put forth any facts to support such a finding.

Plaintiffs responded that Jolly had called Gersenson a liar, which was defamatory and not mere opinion. Plaintiffs also argued that Gersenson was not a limited-purpose public figure because there was no public controversy nor had Gersenson thrust himself into one. According to plaintiffs, Gersenson had merely sought to promote his business. Even if Gersenson were a limited-purpose public figure, plaintiffs contended that they had established an issue of fact regarding actual malice and that further discovery was needed. Defendants countered that no further discovery was needed because all pertinent facts, such as Jolly's statement, were undisputed. Moreover, defendants argued that plaintiffs had failed to put forth any documentary evidence, such as an affidavit, to support their bid for further discovery.

The trial court granted defendants' motion. The court determined that Gersenson was a limited-purpose public figure because there was a public controversy regarding whether the grant had been awarded based on cronyism versus need, and Gersenson intentionally inserted himself

-4-

into that controversy by making public comments and giving public interviews. Accordingly, plaintiffs needed to show actual malice. The court also determined that Jolly's statement did not constitute a statement of fact because it was not provable as true or false. Instead, it was an attempt to clarify Gersenson's statements about the Wendy's and Biggby Coffee lots because Jolly had believed that Gersenson had provided misinformation. The court further reasoned that the challenged statement had been a "rhetorical comment" and expression of opinion. Furthermore, the court determined that plaintiffs had failed to show that Jolly's statement was made with actual malice, reasoning once again that Jolly had merely sought to correct perceived misinformation. Consequently, Jolly's statement was not made with knowledge that the statement was false or with reckless disregard of its truth or falsity, and plaintiffs had failed to present any evidence showing otherwise. The court concluded that dismissal of the defamation claim was proper, which necessarily meant the tortious-interference claim should also be dismissed. This appeal followed.

## II. STANDARD OF REVIEW

This Court reviews the grant or denial of summary disposition de novo. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim, and is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Cantina Enterprises II Inc v Property-Owners Ins Co*, ___ Mich App __, ___; ___ NW3d ___ (2024) (Docket No. 363105); slip op at 3. "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might disagree." *Green v Pontiac Pub Library*, ___Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 363459); slip op at 5. The evidence offered in support of or in opposition to a motion under MCR 2.116(C)(10) is viewed in the light most favorable to the nonmoving party. *Cantina Enterprises*, ___ Mich App at ___; slip op at 3.

## III. DISCUSSION

Plaintiffs argue that the trial court erred by granting summary disposition to defendants. We disagree. While the trial court erred in assessing the nature of the defamatory statement at issue, it correctly concluded that there is no genuine issue of material fact that Gersenson was a limited-purpose public figure and that the statement at issue was not made with actual malice. Accordingly, the trial court's award of summary disposition was proper.

## A. LIMITED-PURPOSE PUBLIC FIGURE

To start, we agree with the trial court that there is no genuine issue of material fact that Gersenson was a limited-purpose public figure in this case. Generally, for a defamation action to succeed, a plaintiff must prove four elements:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Reighard v ESPN, Inc*, 341 Mich App 526, 538; 991 NW2d 803 (2022) (citation omitted).]

-5-

The First Amendment to the United States Constitution, however, places limits on what defamatory speech is actionable. *Id*. at 537-538. Namely, the Constitution "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co v Sullivan*, 376 US 254, 279-280; 84 S Ct 710; 11 L Ed 2d 686 (1964). If a plaintiff is a limited-purpose public figure, the plaintiff must likewise establish by clear and convincing evidence that the defendant made the allegedly defamatory statement with actual malice. *Reighard*, 341 Mich App at 548.

"A limited-purpose public figure is a person who has thrust himself or herself to the forefront of a particular public controversy in order to influence the resolution of the issues involved." *Redmond v Heller*, 332 Mich App 415, 440 n 11; 957 NW2d 357 (2020). This Court has described a public controversy as being a "controversy of wide public concern." *Lins v Evening News Ass'n*, 129 Mich App 419, 432; 342 NW2d 573 (1983).[2] "[A] private person is not automatically transformed into a limited-purpose public figure merely by becoming involved in or associated with a matter that attracts public attention. The court must look to the nature and extent of the individual's participation in the controversy." *New Franklin Enterprises v Sabo*, 192 Mich App 219, 222; 480 NW2d 326 (1991).

We agree with the trial court that there was a public controversy surrounding the $2 million grant to TCCC. As evidenced by the November 2022 Michigan Capitol Confidential article, there was a dispute regarding whether the grant was based on actual need or was instead the product of cronyism. And as plaintiffs allege, by the time of Gersenson's radio interview with defendants, the Michigan Capitol Confidential was planning to publish a second article on the subject. Gersenson inserted himself into the public controversy by requesting that the radio station interview him on the air so that he may have a platform for discussing the grant.

Plaintiffs' arguments to the contrary are unpersuasive. They argue that Gersenson reached out to the radio station not to get involved in a public controversy, but solely because he wanted to promote his business. The undisputed factual allegations in the complaint, however, belie plaintiffs' position. According to plaintiffs, Gersenson, "[a]s part of a concerted effort to raise awareness of the Leelanau Curling Club, and to potentially generate sympathy for its plight, . . . sought a public forum where he could discuss TCCC's grant and the effect it would have on [Leelanau Curling Club]." Gersenson sought out WTCM NewsTalk 580 specifically because he believed the station was "a bastion of conservative ideology" that would be favorable to his position that the grant was wasteful government spending. And, as plaintiffs alleged in their complaint, Gersenson made it "very clear" to defendants that he intended to discuss the grant, not

---

[2] Published decisions of the Court of Appeals issued on or after November 1, 1990, are precedentially binding. MCR 7.215(J)(1). Although this Court is "not strictly required to follow uncontradicted opinions from this Court decided before November 1, 1990, . . . they are nevertheless considered to be precedent and entitled to significantly greater deference than are unpublished cases." *Woodring v Phoenix Ins Co*, 325 Mich App 108, 114-115; 923 NW2d 607 (2018).

merely promote his business. Gersenson's pre-interview notes regarding what he wanted to say on air "included extensive discussion of TCCC's grant," and the radio station obliged Gersenson by allowing him to speak about the grant for a significant portion of the interview. Indeed, Gersenson put out an advertised Facebook post inviting people to listen to the interview to hear him discuss TCCC's $2 million grant and the effects it would have on his business.

Plaintiffs argue that this case is analogous to *Hutchinson v Proxmire*, 443 US 111; 99 S Ct 2675; 61 L Ed 2d 411 (1979). We disagree. In *Hutchinson*, the plaintiff was a research director and professor who received federal funding for his research into emotional behavior through animal studies. *Id*. at 114-115. The defendant, a United States senator, initiated his "Golden Fleece of the Month Award" to publicize what he perceived to be examples of wasteful governmental spending, and then bestowed the award on the federal agencies providing funds to the plaintiff's research. *Id*. at 114. The "award" was presented to the United States Senate in a speech and copies of the speech were then printed out and mailed to hundreds of members of the news media. *Id*. at 115-116. The plaintiff then sued the senator and his legislative assistant for defamation.

The United State Supreme Court held that, under these facts, the plaintiff was not a limited-purpose public figure. *Id*. at 135. The Court reasoned that the defendants had not identified a "particular [public] controversy" but, "at most," had "point[ed] to concern about general public expenditures." *Id*. And the plaintiff "at no time assumed any role of public prominence in the broad question of concern about expenditures." *Id*. Instead, the plaintiff had merely applied for and received federal grants in the course of his work and the only time he participated in media regarding the expenditure of public funds was in response to the media generated by the defendants' press release defaming the plaintiff. *Id*. at 134-135.

Here, there was a pre-existing public controversy surrounding the $2 million state grant awarded to TCCC prior to Gersenson's efforts to become involved in the dispute. By contrast, in *Hutchinson*, there was no record of any media coverage regarding the particular funds received by the plaintiff until after the defendant issued his press release defaming the plaintiff. And while, in *Hutchinson*, the defendant's "award" was aimed at criticizing government spending in general, here, the media coverage predating the radio interview was specific to the grant received by TCCC, concerns about cronyism as to that grant, and the disproportionate number of people served by the specific expenditure. And Gersenson's efforts to insert himself into the public controversy in this case are highly distinguishable. Gersenson sought out media attention with the specific goal of discussing TCCC's grant on a public platform. The plaintiff in *Hutchinson* engaged in no analogous behavior. He merely became "involved in or associated with a matter that attracts public attention" by receiving federal funds in the course of his work, which was insufficient to transform him into a limited-purpose public figure with respect to the defamation that occurred. *New Franklin Enterprises*, 192 Mich App at 222. Thus, we agree with the trial court's conclusion that Gersenson was a limited-purpose public figure and that plaintiffs have failed to demonstrate a genuine issue of material fact on the matter.

## B. NATURE OF DEFAMATORY STATEMENT

Next, plaintiffs argue that the trial court erred by determining that Jolly's statement was a protected opinion and not a statement of determinable fact. We agree.

-7-

A statement becomes "defamatory if it tends to lower an individual's reputation in the community or deters third persons from associating or dealing with that individual." *Reighard*, 341 Mich App at 538 (quotation marks and citation omitted). Even if a statement is defamatory, however, a plaintiff cannot maintain an action for defamation if the "statement cannot be reasonably interpreted as stating actual facts about the plaintiff"; under such circumstances, the First Amendment protects the statement. *Id*. at 538 (quotation marks and citation omitted). "Thus, at least some expressions of opinion are protected," *id*. (quotation marks and citation omitted), but not all, *Ireland v Edwards*, 230 Mich App 607, 616; 584 NW2d 632 (1998).

"[A] statement must be provable as false to be actionable," regardless of whether the plaintiff is a public figure. *Id*. at 616 & n 7 (citation omitted). This Court has highlighted two examples set forth by the United States Supreme Court:

> By way of example, the Court suggested that the statement "In my opinion Mayor Jones is a liar" would be potentially actionable, while the statement "In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin" would not be actionable. The Court apparently intended these examples to illustrate the difference between an objectively verifiable event, such as lying, and a subjective assertion like "shows his abysmal ignorance . . . ." [*Id*. at 616 (citations omitted).]

Given that some "*types* of speech are protected," such as "rhetorical hyperbole," *id*. at 617-618, "statements must be viewed in context to determine whether they can reasonably be understood as stating actual facts about the plaintiff," *id*. at 618. Summary disposition is appropriate when the statement cannot possibly have defamatory meaning. *Id*. at 619.

Here, Gersenson made statements during the radio interview that could lead a listener to infer that TCCC had sold the lots in question to Wendy's and Biggby Coffee. Initially, Jolly merely attempted to clarify Gersenson's statements. Plaintiffs do not challenge this or dispute that TCCC did not sell the lots in question. Jolly, however, then went a step further by insinuating that Gersenson had intentionally fabricated information to the contrary. Jolly framed his explanation by labeling Gersenson "bitter[]" at the outset. While this was protected opinion, it nonetheless was important context for the remainder of Jolly's remarks. Jolly concluded by stating, "[B]ut I'd say [Gersenson]'s *got a good thing going there* and we wish him the best but no need *to make things up*." (Emphasis added.) This statement insinuated that Gersenson had intentionally misled the audience because he was bitter and wanted to further his own business interests. Such a statement would undoubtedly have the effect of lowering Gersenson's reputation within the community. See *Reighard*, 341 Mich App at 538. And Jolly's statement could be reasonably understood as stating an actual fact about Gersenson—namely, that he had intentionally misled the radio audience in an effort to further his own gains. Whether Gersenson was intentionally fabricating information was a provable fact. See *Ireland*, 230 Mich App at 619-620. Accordingly, Jolly's statement was potentially actionable because it went beyond protected opinion and was capable of defamatory meaning. The trial court erred by concluding as a matter of law that Jolly's statement was a mere opinion that could not sustain a claim for defamation.

## C. ACTUAL MALICE

While the trial court erred in assessing the nature of the defamatory statement at issue, reversal is not warranted because, as discussed above, plaintiffs could only sustain their claim for defamation in this case if they could show a genuine factual dispute as to whether the statement was made with actual malice. We agree with the trial court that plaintiffs failed to do so and, relatedly, that they failed to show that summary disposition on that basis was premature.

As discussed, if a plaintiff is a "limited-purpose public figure, he must . . . establish by clear and convincing evidence that [the defendant] made the allegedly defamatory implication with actual malice." *Reighard*, 341 Mich App at 548. Actual malice does not equate "to a defendant's motive or any sense of ill will in the ordinary sense of the term"; rather, "[a]ctual malice is defined as knowledge that the published statement was false or as reckless disregard as to whether the statement was false or not." *Id.* at 548-549 (citation omitted). As this Court has explained, "[r]eckless disregard for the truth is not established merely by showing that the statements were made with preconceived objectives or insufficient investigation. Furthermore, ill will, spite or even hatred, standing alone, do not amount to actual malice." *Id.* at 549 (citation omitted). And reckless disregard is measured not by "whether a reasonably prudent man would have published or would have investigated before publishing," but by "whether the publisher in fact entertained serious doubts concerning the truth of the statements published." *Ireland*, 230 Mich App at 622. Consequently, "actual malice is a subjective concept." *Reighard*, 341 Mich App at 549 (quotation marks and citation omitted). "However, a defendant will not automatically prevail in a defamation case by stating that the statements were made with a belief that they were true, because a defendant's state of mind may be established through circumstantial evidence[.]" *Id.* at 550 (quotation marks and citation omitted).

As noted, there is no dispute that TCCC did not sell the lots in question to Wendy's or Biggby Coffee. While plaintiffs maintain that Gersenson did not say otherwise, they concede that a reasonable listener could have been confused by his comments on the topic. Jolly's statement in response indicated that Gersenson was misrepresenting facts about the sale of the lots to further his own business interests. But plaintiffs point to no evidence, nor have they even pleaded any factual allegations, which would show that Jolly had actual knowledge that his statement—that Gersenson was "mak[ing] things up" because he was "bitter[]"—was false. See *Reighard*, 341 Mich App at 548-549. While plaintiffs point, for instance, to certain evidence and allegations to support the notion that Gersenson knew TCCC did not sell the lots and did not mean to say or suggest otherwise, they identify nothing which would show that Jolly himself knew that Gersenson was not attempting to be misleading in his comments. Nor do plaintiffs point to any evidence or factual allegations which would show that Jolly "in fact entertained serious doubts concerning the truth" of his statement that Gersenson was "mak[ing] things up," and therefore acted in reckless disregard of the falsity of the statement. *Ireland*, 230 Mich App at 622. There are no allegations or evidence, for example, that Jolly himself doubted whether Gersenson was lying or attempting to be misleading, as opposed to simply presenting truthful information in an unintentionally confusing way.

Citing *Harte–Hanks Communications, Inc v Connaughton*, 491 US 657; 109 S Ct 2678; 105 L Ed 2d 562 (1989), plaintiffs argue that they can establish reckless disregard by showing that Jolly made a "deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of his statement. Plaintiffs argue that Jolly made a deliberate decision not to clarify whether Gersenson was implying that TCCC had sold the lots to Wendy's and Biggby Coffee. But

as plaintiffs acknowledge, it is well settled that the failure to investigate the accuracy of a statement before publishing it, even when a reasonably prudent person may have done so, is not sufficient to establish that the defendant acted with reckless disregard for the truth. *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 117; 793 NW2d 533 (2010). Instead, as the *Connaughton* Court explained, the failure to investigate must rise to the level of "purposeful avoidance of the truth" to establish actual malice. *Connaughton*, 491 US at 692.

For instance, in *Connaughton*, the defendant-publisher had been provided, prior to its publication of the defamatory statements at issue, with a tape-recorded interview of a "key witness" that would have shown the statements to be false. *Id.* at 692. The publisher, however, did not listen to the tape recording, nor did it make any effort to interview the witness, despite knowing her importance to the matter and interviewing each of the other six witnesses. *Id.* at 682, 692. In this case, by contrast, there is nothing to indicate that Jolly, prior to saying Gersenson was "mak[ing] things up," had been presented with, but purposefully avoided, information that would have made clear that Gersenson was not trying to be misleading when he made his comments during the interview. At most, plaintiffs point to evidence and allegations that, when taken as true and viewed in the light most favorable to them, would potentially support the conclusion that it would have been "reasonably prudent" for Jolly to investigate further before speaking to Gersenson's intentions—but that does not constitute actual malice. *Smith*, 487 Mich at 117; *Ireland*, 230 Mich App at 622.

Plaintiffs also rely on evidence that defendants refused their request to make a retraction. While evidence of a defendant's failure to retract may be relevant and admissible to establish actual malice, see, e.g., *Peisner v Detroit Free Press, Inc*, 104 Mich App 59, 65; 304 NW2d 814 (1981), plaintiffs do not identify, and we are not aware of, any case which holds that such evidence, standing alone, is sufficient to survive summary disposition with regard to actual malice. Nor is it apparent to us how defendants' refusal in this case would be enough to create a genuine factual dispute in that regard. Plaintiffs also point to their allegations regarding the personal relationship between Jolly and Piche, including the allegation that the two spoke the day before the radio interview, arguing that these circumstances explain why Jolly would have been motivated to attack Gersenson's credibility. But as plaintiffs acknowledge, actual malice does not equate "to a defendant's motive or any sense of ill will," and it is not established merely by showing that the defamatory statement was made with preconceived objectives. *Reighard*, 341 Mich App at 548-549.

Finally, plaintiffs argue that any lack of evidentiary support for their position at this stage of the case should not have resulted in dismissal because defendants moved for, and the trial court granted, summary disposition before discovery had been completed, and plaintiffs had a number of factual matters that they were still seeking to develop further. "When a motion for summary disposition is filed before the close of discovery, the operative question is whether summary disposition is premature because further discovery stands a fair chance of uncovering factual support for the nonmovant's position." *Glorycrest Carpenter Rd, Inc v Adams Outdoor Advertising Limited Partnership*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 366261); slip op at 11. "Summary disposition is generally premature if it is granted before discovery is complete," but "the mere fact that the discovery period remains open does not automatically mean that the trial court's decision to grant summary disposition was untimely or otherwise inappropriate." *Id.* (quotation marks and citation omitted). "Instead, the nonmovant

must identify disputed issues and support that further discovery stands a fair chance of uncovering additional factual support through independent evidence." *Id*. The nonmoving party, for instance, "must offer the required MCR 2.116(H) affidavits, with the probable testimony to support its contentions." *Id.* (quotation marks and citation omitted). "Mere speculation that additional discovery may uncover supporting evidence is not enough." *Id*.

While plaintiffs identify certain areas that they would like to explore further in discovery, they have not offered supporting affidavits or otherwise adequately substantiated their claim that summary disposition was premature. Nor have they even meaningfully explained how further discovery into the areas they have identified "stands a fair chance of uncovering factual support" for their position such that summary disposition should not have been granted. *Id*. Plaintiffs assert that they would like to "develop the facts" regarding the relationship between Jolly and Piche, including their conversation prior to Gersenson's interview, as well as the circumstances surrounding defendants' refusal to retract Jolly's statement. Plaintiffs, however, fail to explain exactly what evidence they hope to further develop as to these topics and, as already discussed, nothing in plaintiffs' allegations or the existing evidence on these topics indicates the existence of a genuine issue of material fact as to actual malice. Plaintiffs also seek discovery into "post-interview discussions and communications" between defendants and "other witnesses" about the interview, but wholly fail to identify what "witnesses" or "discussions and communications" they might have in mind and offer no explanation as to how that evidence would lend meaningful factual support to their arguments. Likewise, plaintiffs seek further discovery regarding "the degree to which Jolly's misinterpretation of Gersenson's statement . . . was reasonable," but again fail to identify what evidence may exist in this regard or how to it would contribute meaningful factual support to their arguments—particularly given that what plaintiffs must show is not that Jolly failed to act as a reasonable person would in making the statement at issue, but that he made the statement with actual malice. See *Smith*, 487 Mich at 117; *Ireland*, 230 Mich App at 622. As the trial court correctly recognized, plaintiffs have failed to demonstrate that there is a genuine issue of material fact on that point, or that further discovery is needed before that assessment can be properly made.

## IV. CONCLUSION

The trial court correctly found that Gersenson was, as a matter of law, a limited-purpose public figure and that plaintiffs failed to demonstrate a genuine issue of material fact as to actual malice. We are unpersuaded by plaintiffs' argument that further discovery in this case would uncover factual support for their arguments such that summary disposition on their defamation claim should not have been granted. And, because plaintiffs' tortious-interference claim was undisputedly premised on the viability of their defamation claim, the trial court did not err in dismissing the tortious-interference claim as well.

Affirmed.

/s/ Thomas C. Cameron
/s/ Kristina Robinson Garrett
/s/ Philip P. Mariani